**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NORTH AMERICAN DERIVATIVES
EXCHANGE, INC., d/b/a OG,


*Plaintiff*,

v.


LETITIA JAMES, in her official capacity as
Attorney General of New York; ROBERT
WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRYAN O'DWYER, in
his official capacity as Chair and
Commissioner of the New York State Gaming
Commission; JOHN A. CROTTY, in his
official capacity as Commissioner of the New
York State Gaming Commission; SYLVIA B.
HAMER, in her official capacity as
Commissioner of the New York State Gaming
Commission; MARTIN J. MACK, in his
official capacity as Commissioner of the New
York State Gaming Commission; PETER J.
MOSCHETTI, JR., in his official capacity as
Commissioner of the New York State Gaming
Commission; MARISSA SHORENSTEIN, in
her official capacity as Commissioner of the
New York State Gaming Commission; JERRY
SKURNIK, in his official capacity as
Commissioner of the New York State Gaming
Commission; NEW YORK STATE GAMING
COMMISSION,

*Defendants*.

Civil Action No. 26-cv-04980-VM

**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT............................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Congress Established a Comprehensive Regulatory Scheme for Exclusive Federal Oversight of Futures Markets ......................................................................3

    B.    OG Is Registered as a CFTC-Designated Contract Market Under Federal Law ............6

    C.    The New York Regulatory & Enforcement Scheme......................................................7

    D.    Enforcement of New York Laws Against OG's Peer Companies ...............................8

    E.    OG Offers Event Contracts in New York....................................................................9

ARGUMENT.........................................................................................................................9

I.    OG IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CEA PREEMPTS  APPLICATION OF NEW YORK GAMING LAW TO CFTC-REGULATED EVENT CONTRACTS ..................................................................10

    A.    The CEA Expressly Preempts New York Gaming Law as Applied to OG .................10

    B.    New York's Sports Wagering Laws Are Field Preempted as Applied to OG..............11

    C.    New York's Gaming Laws Are Conflict Preempted as Applied to OG ......................17

II.    OG WILL SUFFER IRREPARABLE HARM IF THE REQUESTED RELIEF IS NOT GRANTED ...........................................................................................22

    A.    OG Will Suffer Irreparable Harm Absent Preliminary Relief....................................22

    B.    OG Will Suffer Irreparable Harm if It Complies with Preempted New York Statutes......................................................................................................................23

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT ENJOINING ENFORCEMENT OF NEW YORK'S GAMING LAWS..............................25

IV.    NO SECURITY OR AT MOST *DE MINIMIS* SECURITY IS APPROPRIATE .................26

CONCLUSION.....................................................................................................................26

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Amarin Pharma, Inc. v. United States FDA*,
119 F. Supp. 3d 196 (S.D.N.Y. 2015)..................................................................................25

*American Agriculture Movement, Inc. v. Board of Trade*,
977 F.2d 1147 (7th Cir. 1992) ...............................................................................4, 13, 18, 21

*Arizona v. United States*,
567 U.S. 387 (2012).................................................................................10, 12, 15, 18, 19

*Bibbo v. Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) ................................................................................................20

*CFTC v. British  American Commodity Options*,
560 F.2d 135 (2d Cir. 1977)..................................................................................................25

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)..........................................................................................................17, 20

*DGM Investments, Inc. v. New York Futures Exchange, Inc.*,
No. 01-cv-11602, 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)...........................................12, 21

*Doctor's Associates, Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996)....................................................................................................26

*Effex Capital, LLC v. National Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) ................................................................................................20

*Ford v. Reynolds*,
316 F.3d 351 (2d Cir. 2003)..................................................................................................22

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001).............................................................................................13

*Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*,
No. 79-cv-5724, 1982 WL 1348 (S.D.N.Y. Nov. 10, 1982)..........................................................12

*Hines v. Davidovitz*,
312 U.S. 52 (1941)................................................................................................................18

*Hofmayer v. Dean Witter & Co.*,
459 F. Supp. 733 (N.D. Cal. 1978) ................................................................................ 13-14

*Immigration & Naturalization Service v. Cardoza-Fonseca*,
480 U.S. 421 (1987)..................................................................................................................15

*International Trading Ltd. v. Bell*,
556 S.W.2d 420 (Ark. 1977)....................................................................................................14

*John E. Andrus Memorial, Inc. v. Daines*,
600 F. Supp. 2d 563 (S.D.N.Y. 2009).....................................................................................22

*Jones v. B.C. Christopher & Co.*,
466 F. Supp. 213 (D. Kan. 1979).............................................................................................14

*KalshiEX LLC v. Commodity Futures Trading Commission*,
No. 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024), *appeal dismissed*, No. 24-
5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025)..................................................................3, 5

*KalshiEX LLC v. Johnson*,
No. 26-cv-01715, 2026 WL 1223373 (D. Ariz. May 5, 2026)...............................2, 11, 13, 22, 25

*KalshiEx LLC v. Orgel*,
No. 26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)....................................................2

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ....................................................................................... *passim.*

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)......................................................................................................12

*Louisiana Public Service Commission v. Federal Communication Commission*,
476 U.S. 355 (1986)..................................................................................................................15

*Marentette v. Abbott Laboratories, Inc.*,
886 F.3d 112 (2d Cir. 2018)......................................................................................................18

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)..................................................................................................................11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)..................................................................................................................15

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)..................................................................................................................22, 23

*Mutual Pharmaceutical Co. v. Bartlett*,
570 U.S. 472 (2013)..................................................................................................................21

iii

*Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission*,
461 U.S. 190 (1983)............................................................................................................11, 12

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981)......................................................................................12, 21

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .....................................................................................................21

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)......................................................................................................24

*Shapiro v. Cadman Towers, Inc.*,
51 F.3d 328 (2d Cir. 1995).........................................................................................................22

*Sinclair & Co. v. Gurule*,
757 P.2d 225 (Idaho Ct. App. 1988)....................................................................................13, 21

*Taylor v. Bear Stearns & Co.*,
572 F. Supp. 667 (N.D. Ga. 1983).............................................................................................14

*Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*,
322 F.3d 1039 (9th Cir. 2003) ...................................................................................................21

*United States & CFTC v. Arizona*,
No. 26-cv-2246 (D. Ariz. Apr. 2, 2026) ....................................................................................16

*United States & CFTC v. Connecticut*,
No. 26-cv-00498 (D. Conn. Apr. 2, 2026)..................................................................................16

*United States & CFTC v. Illinois*,
No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026).....................................................................................16

*United States & CFTC v. Minnesota*,
No. 26-cv-02661 (D. Minn. May 19, 2026).................................................................................16

*United States & CFTC v. New York.*,
No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026) .................................................................................16

*United States & CFTC v. Wisconsin*,
No. 26-cv-749 (E.D. Wis. Apr. 28, 2026)...................................................................................16

*United States v. State of New York*,
708 F.2d 92 (2d Cir. 1983).........................................................................................................22

*Williams v. Marinelli*,
987 F.3d 188 (2d Cir. 2021)........................................................................................................11

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)........................................................................................................10

*Ex parte Young*,
209 U.S. 123 (1908)....................................................................................................22

**STATUTES & RULES**

7 U.S.C. § 1a(47)(A)..................................................................................................7, 11

7 U.S.C. § 2(a)(1)(A) .............................................................................1, 4, 6, 10, 11, 12

7 U.S.C. § 2(e) ..........................................................................................................4, 15

7 U.S.C. § 7(a) ..........................................................................................................4, 15

7 U.S.C. § 7(d) ...............................................................................................................16

7 U.S.C. § 7a-2(c) ..................................................................................5, 6, 7, 16, 17, 19

7 U.S.C. § 13a...................................................................................................................24

18 U.S.C. § 1084(a)......................................................................................................8, 19

17 C.F.R. § 38.100(a)........................................................................................................24

17 C.F.R. § 38.1101(a)(2) ................................................................................................15

17 C.F.R. § 38.150 ............................................................................................................20

17 C.F.R. § 38.151(b) ...........................................................................................4, 20, 24

17 C.F.R. § 38.250 ............................................................................................................20

17 C.F.R. § 38.255 ......................................................................................................20, 24

17 C.F.R. § 38.3(a)........................................................................................................4, 15

17 C.F.R. § 38.450 ............................................................................................................15

17 C.F.R. § 38.950 ............................................................................................................15

17 C.F.R. § 40.11(c)......................................................................................................5, 16

17 C.F.R. § 40.2(a)......................................................................................................5, 6, 7

17 C.F.R. § 40.3(a)..............................................................................................................5

Fed. R. Civ. P. 65...............................................................................................................26

v

N.Y. Penal Law §§ 225.00 et seq...........................................................................................8

N.Y. Penal Law § 225.10.............................................................................................8, 9, 19

N.Y. Penal Law § 225.20...................................................................................................9, 19

N.Y. Penal Law § 70.00(2)(e)............................................................................................9, 19

N.Y. Penal Law § 80.10(1)................................................................................................9, 19

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 104(9) ...............................................................8

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(4)(b) ...................................................7, 9

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(2)(a)....................................................8, 9

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367(1)(x) .........................................................8

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367(2)(a)..........................................................8

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367(16)(a)........................................................9

U.S. Const. art. VI cl. 2.......................................................................................................10

## OTHER AUTHORITIES

120 Cong. Rec. 30,464 (Sept. 9, 1974) ..............................................................................4, 14

CFTC Division of Enforcement, Enforcement Manual (2020)........................................... 16, 19

*Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974)............................................................4, 13

H.R. Rep. No. 93-975 (1974)............................................................................................ 13, 15

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657 (1982) ............................................................................................14

N.Y. Off.  Atty.  Gen., *Attorney General James and Governor Hochul Defend Enforcement Actions Against Prediction Markets*, (April 24, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-and-governor-hochul-defend-enforcement-actions-against............8

S. Rep. No. 93-1131 (1974)............................................................................................... 14-15

S. Rep. No. 93-1194 (1974)...................................................................................................14

Plaintiff North American Derivatives Exchange, Inc. d/b/a OG ("OG") respectfully moves for a preliminary injunction against Defendants' threatened enforcement of New York gaming laws to prohibit trading of federally regulated event contracts listed on OG's Designated Contract Market ("DCM").

**PRELIMINARY STATEMENT**

OG seeks injunctive relief to restrain the Attorney General of New York ("New York Attorney General"), the New York Gaming Commissioners, and the New York Gaming Commission ("State Gaming Commission") (collectively, "Defendants") from improperly and under color of New York law assuming jurisdiction over and regulating OG's listing of lawful derivatives contracts on its federally regulated market.  It is not within the remit of Defendants— nor any other state authority in any state—to assume jurisdiction of this federal market and require OG to either (i) prohibit New York residents from accessing its trading market or (ii) risk an enforcement action by New York State authorities.

Indeed, the New York Attorney General has purported to assert jurisdiction over two federally regulated markets, seeking to enjoin their offering of event contracts: Gemini Titan, LLC ("Gemini"), a DCM, and Coinbase Financial Markets, Inc. ("Coinbase"), a futures contract market ("FCM").  Gemini, Coinbase, and OG are regulated by the U.S. Commodity Futures Trading Commission ("CFTC"), and the conduct that Defendants seek to regulate (and prohibit) involves the listing of contracts authorized to be traded under federal law and that by statute fall within the "exclusive jurisdiction" of the CFTC.  The crux of Defendants' assertion of authority is their conclusion that, notwithstanding federal regulation, contracts traded on DCM exchanges are "unlawful gambling," "sports wagering," and "bets or wagers" subject to New York gaming laws.

But federal law vests the CFTC with "exclusive jurisdiction" to regulate derivatives on DCMs, including the event contracts at issue here.  7 U.S.C. § 2(a)(1)(A).  Several courts have

upheld or granted preliminary injunctions enjoining states from imposing state regulation on a DCM based on federal preemption by the CEA. *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026) (hereinafter "*Kalshi v. Flaherty*") ("Because Kalshi has demonstrated a reasonable chance of success on its argument that the [CEA] preempts otherwise applicable state law, we will affirm."); *KalshiEX, LLC v. Johnson*, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX, LLC v. Orgel*, 2026 WL 474869, at *11 (M.D. Tenn. Feb. 19, 2026). This Court should reach the same conclusion.

The derivatives in question here trade in a national market that is heavily regulated at the federal level. OG is registered with and designated by the CFTC pursuant to the CEA as a self-regulatory organization within a regulated marketplace. The CFTC prescribes rules that govern what types of derivatives may be listed and provides for examination, enforcement, and penalties in the event its rules are violated. OG offers derivatives to be traded in full compliance with those rules.

Efforts by state gaming authorities to assume jurisdiction over the derivatives markets are nothing new. For decades leading up to the enactment of the CEA, state regulators sought to regulate all manner of derivatives products, including under state gaming law. In 1936, Congress made a deliberate policy choice to remove derivatives contracts from state regulation, providing for uniform nationwide rules. That decision has been repeatedly re-affirmed. And both Congress and the CFTC have developed specific rules pursuant to which the CFTC may—but is not required to—disallow the trading of event contracts that reference gaming.

The issue presented in this case is straightforward: the only questions before the Court are whether OG is in fact a federally regulated DCM (it demonstrably is), whether the contracts at issue are traded on OG's DCM (they demonstrably are), and whether the Court will enforce the CFTC's "exclusive jurisdiction" to regulate such contracts (it should).

OG is entitled to a preliminary injunction because Defendants threaten immediate and irreparable injury by assuming regulatory jurisdiction over federally regulated event contracts and attempting to prohibit OG from making its trading market available in New York. If Defendants are permitted to do so, OG would suffer immediate injury in the form of unrecoupable compliance costs, lost business opportunities, reputational damage, and potential collateral effects to its business from being found to have engaged in unlawful activities. OG's users would also be harmed by the forced pausing or liquidation of New York users' contracts and the ensuing market disruptions. Moreover, because money damages are generally not available against a state, OG's injury would be unredressable, even if it were to ultimately prevail in this litigation. Accordingly, OG respectfully requests that the Court issue a preliminary injunction.

## BACKGROUND

### A. Congress Established a Comprehensive Regulatory Scheme for Exclusive Federal Oversight of Futures Markets

The CFTC regulates financial derivatives contracts and their markets. Derivatives contracts are financial tools that allocate risk between counterparties. *See KalshiEX, LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1–2 (D.D.C. Sept. 12, 2024) (hereinafter "*Kalshi v. CFTC*"), *appeal dismissed*, 2025 WL 1349979 (D.C. Cir. May 7, 2025). Historically, the archetypal example is a grain futures contract, which allows buyers to lock in prices and manage agricultural market volatility by agreeing to buy or sell a specified amount of a crop at a fixed price on a future date. For over a century, the federal government has regulated national derivatives markets to promote uniformity and integrity in national trading.

Under the CEA, the CFTC has exclusive jurisdiction to regulate commodities and futures on designated exchanges. Congress enacted the CEA in 1936 to replace the fragmented system of state oversight with a uniform federal framework for regulating commodities and futures markets. In 1974,

3

Congress amended the CEA to modernize and centralize federal oversight, expressly granting the CFTC "exclusive jurisdiction" over futures markets. 7 U.S.C. § 2(a)(1)(A). Congress feared inconsistent state regulations could destabilize futures markets, noting concerns that "states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992). As one Senator warned, applying varied state laws to futures trading "would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry* (hereinafter "Senate Hearings"), 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Prior to passing the 1974 amendments, the Senate removed a provision from the CEA that would have preserved state authority over futures trading, thereby confirming the CFTC's exclusive regulatory power. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

The CFTC's regulatory framework is comprehensive and exclusive. *See Kalshi v. Flaherty*, 172 F.4th at 230 ("[T]here's little doubt that the Act is 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'"). To offer derivatives for public trading, an exchange must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The application for such a designation must provide detailed information demonstrating the exchange's capacity to abide by the CEA, including the CFTC's "Core Principles" for DCMs, which include, among other requirements, providing "impartial access" to the DCM. 17 C.F.R. §§ 38.3(a)(2), 38.151(b). Under the scheme Congress established, once the CFTC has designated an exchange as a contract market, the CFTC has "exclusive jurisdiction" and enforcement powers to regulate derivatives—including any swaps and futures—traded on that DCM. *See* 7 U.S.C. § 2(a)(1)(A).

As long as the DCM abides by CEA requirements and CFTC regulations, it may list contracts on its exchange without pre-approval from the CFTC. A CFTC-designated contract market may certify

4

that a contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing.  7 U.S.C. § 7a-2(c)(1); *see also* 17 C.F.R. § 40.2(a).  Within ten days, the CFTC reviews the reports and may initiate review of any contract.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  If the CFTC does not take action within the ten-day period, the contract becomes "effective."  *See* 7 U.S.C. § 7a-2(c)(2).  Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing.  7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA.  7 U.S.C. § 7a-2(c)(5)(B).

Among the products the CFTC regulates under this regime are event contracts listed on DCMs. Event contracts are a type of derivatives contract with a payment schedule based on the outcome of a specified event as of an expiration date.  The purchaser of an event contract takes a position on an event's outcome—usually a "yes" or "no" position, with "yes" meaning the event will occur by the expiration date and "no" meaning the event will not occur.  The "yes" position purchaser profits if the specified outcome occurs by the expiration date, while the "no" position purchaser profits if it does not.  The event contract's purchase price fluctuates based on supply and demand, reflecting the market's perception of the likelihood of the event's occurrence or non-occurrence.  The event contract holder may sell their position at a profit or loss prior to expiration.  An event contract could be tied to a variety of events, including specified movements of a financial index; a particular yield on the 10-year U.S. treasury note; the magnitude of the upcoming hurricane season; or the outcome of political, scientific, or live sporting events.

The CFTC regulates event contracts as a derivative referencing an "excluded commodity," a category which includes specified commodities that are not subject to the same set of CEA regulations as physical commodities.  *See id.* §§ 1a(19), (47)(A)(ii), (iv), (vi); *see also Kalshi v. CFTC*, 2024 WL 4164694, at *2–3.  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded

commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). Events themselves constitute "excluded commodities" under the CEA, defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

The CEA contains a "Special Rule" authorizing—but not requiring—the CFTC to prohibit specific types of event contracts it determines to be "contrary to the public interest." The CFTC has discretionary authority to deem contracts contrary to the public interest if they "involve" (i) "activity that is unlawful under any Federal or State law"; (ii) "terrorism"; (iii) "assassination"; (iv) "war"; (v) "gaming"; or (vi) "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

**B.      OG Is Registered as a CFTC-Designated Contract Market Under Federal Law**

The CFTC first certified OG as a DCM in 2004, confirming its market complied with the CEA. (ECF No. 1 ("Compl.") ¶ 70.) Most recently, in September 2025, the CFTC amended OG's registration, reconfirming its compliance with the CEA. (*Id.*) For two decades, the entity now known as OG has operated continuously as a CFTC-regulated DCM and has been fully regulated as a derivatives exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange. (*See id.*) Because OG operates as a CFTC-designated contract market, its event contracts fall under the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Under this designation, OG is subject to a comprehensive set of federal obligations designed to safeguard market integrity.

On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a), OG's predecessor certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations" contracts. (*See* Jan. 30, 2025 Certification Letter, attached to the Declaration of Robert A. Fumerton as Exhibit A, at 1.) These contracts allow users to trade

6

on the outcome of live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events. (*See id.* at 4–5.) OG's predecessor designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises." (*Id.* at 8.) These Industry Event–Live Presentations contracts provide for payment "dependent on the occurrence [or] nonoccurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence" and are therefore "swaps" as defined by the CEA. 7 U.S.C. § 1a(47)(A)(ii).

Under the process described above, as a CFTC-designated contract market, OG ensured that these contracts adhered to product-related regulatory standards and certified that they complied with applicable law prior to the time of listing. *See* 7 U.S.C. § 7a-2(c)(1)-(2); 17 C.F.R. § 40.2(a). OG's contracts with return profiles that are dependent on the outcome of live events at issue here have all been certified and deemed "effective" under this process. *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2(a). OG was launched in February of 2026 to provide a separate technology platform for users to access listed event contracts, distinct from the North American Derivatives Exchange, Inc.'s other offerings. (Compl. at 2 n.1.)

## C.    The New York Regulatory & Enforcement Scheme

The State Gaming Commission regulates gaming in the state of New York through a licensing regime. (Compl. ¶¶ 77, 95.) Particularly relevant to the present dispute are New York's laws on gambling enterprises. New York requires that any gambling enterprise that offers sports gaming— including wagers on sporting events—seek a license from the State Gaming Commission. *See* N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(4)(b). Under New York law, sports wagering is defined as

7

"wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events." N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367(1)(x). New York law only permits wagers to be made by individuals at a casino or on licensed mobile sports wagering platforms. *See* N.Y. Rac. Peri-Mut. Wag. & Breed. Law §§ 1367(2)(a); 1367-a(2)(a). Offering sports gaming in New York in a manner that violates the state's gaming laws can constitute a felony, exposing violators to civil and criminal penalties. *See* N.Y. Penal Law §§ 225.00 et seq.; N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 104(9).

**D.    Enforcement of New York Laws Against OG's Peer Companies**

In April 2026, the New York Attorney General filed complaints against Gemini, a federally regulated DCM, and Coinbase, a federally regulated FCM, in New York state court. (Compl. ¶ 76.) Both enforcement actions came after these companies advertised their event contract offerings on their platforms. (*Id.*) OG's attempt to bring its business to the state of New York will likely be subject to the same fate. Indeed, New York's Governor and Attorney General have pledged to "not hesitate to hold [prediction markets] accountable" and to "continu[e] to defend [New York's] laws in court."[1]

In lawsuits already filed against the two CFTC-regulated markets, the New York Attorney General alleged that these federally regulated entities are liable for penalties under Executive Law § 63(12) for repeated violations of Article I, § 9 of the New York State Constitution and the Federal Interstate Wire Act, 18 U.S.C. § 1084(a). *See* Verified Petition ¶ 12, *New York v. Gemini Titan, LLC*, No. 451603/2026 (Sup. Ct., N.Y. Cnty. Apr. 21, 2026); Verified Petition ¶ 12, *New York v. Coinbase Fin. Mkts. Inc.*, No. 451604/2026 (Sup. Ct., N.Y. Cnty. Apr. 21, 2026). The Attorney

---

[1]    N.Y. Off. Atty. Gen., *Attorney General James and Governor Hochul Defend Enforcement Actions Against Prediction Markets*, (April 24, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-and-governor-hochul-defend-enforcement-actions-against.

8

General contends that such conduct violates New York Penal Law § 225.10 (promoting gambling in the first degree) and New York Penal Law § 225.20 (possession of gambling records in the first degree)—both class E felonies.  *See* N.Y. Penal Law §§ 225.10, 225.20.  Under New York law, a single class E felony carries a potential prison term of up to four years and a fine of the greater of $80,000 or "three times the amount of the corporation's gain from the commission of the offense."  N.Y. Penal Law §§ 70.00(2)(e), 80.10(1).  The Attorney General further asserts violations of Racing Law § 1367(16)(a) (sports wagering), Racing Law § 1367-a(2)(a) (operating an unlicensed mobile sports wagering platform), and Racing Law § 1367-a(4)(b) (operating an unlicensed sports wagering platform).  Each such violation carries a civil penalty of up to $100,000, with aggregate penalties reaching as high as $5,000,000 for violations arising out of the same transaction or occurrence.  *See* N.Y. Rac.  Pari-Mut. Wag. & Breed. Law § 1367(16)(a).

**E.**      <u>**OG Offers Event Contracts in New York**</u>

On June 12, 2026, OG made its event contracts available to New York residents through its OG.com website and application.  (Compl. ¶ 2.)  On the same day, OG filed this suit seeking declaratory and injunctive relief to restrain Defendants from improperly and under color of New York law assuming jurisdiction over and regulating OG's listing of lawful derivatives contracts on its federally regulated market.  (*Id*. ¶ 1.)

On June 17, 2026, the parties met and conferred regarding this motion pursuant to Rule VII.D of the Court's Individual Practices.  Defendants oppose the requested injunction and agreed to the briefing schedule proposed to this Court, filed herewith.  OG then filed the present motion.

<u>**ARGUMENT**</u>

OG is entitled to a preliminary injunction, governed by Federal Rule of Civil Procedure 65.  To attain such relief, a movant must establish that (1) they are likely to succeed on the merits; (2) they are

likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor, and (4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). OG meets each element. Critically, Defendants' threatened enforcement of New York's interpretation of state gaming laws to prohibit trading of federally regulated event contracts subjects OG and its users to immediate and irreparable harm absent a preliminary injunction.

**I.      OG IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CEA PREEMPTS APPLICATION OF NEW YORK GAMING LAW TO CFTC-REGULATED EVENT CONTRACTS**

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2). "Under this principle, Congress has the power to preempt state law." *Id.* There are three types of federal preemption: express, field, and conflict. *Id.* A court's inquiry is the same under each—whether Congress intended a particular federal law to preempt state law. All three types of preemption apply to event contracts listed on OG.

**A.      The CEA Expressly Preempts New York Gaming Law as Applied to OG**

Congress may preempt state law "by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. Congress expressed its intent in the text of the CEA that state law is preempted as to CFTC-regulated derivatives:

> The [CFTC] shall have *exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of [the CEA] or a swap execution facility pursuant to section 7b–3 of [the CEA] or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of [the CEA].

7 U.S.C. § 2(a)(1)(A) (emphasis added).

The event contracts traded on OG are exactly that—derivatives contracts traded on a DCM.

Event contracts are "swaps" as defined by the CEA, because they are an "agreement, contract, or transaction" that provides for a payment "dependent on the occurrence [or] non-occurrence" of a specified event "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Events, including sports events, carry *actual* financial, economic, and commercial consequences for a variety of market participants. Event contracts could be based on the occurrence, nonoccurrence, or extent of an occurrence of a weather event such as snowfall or rainfall, a Federal Reserve Board rate increase, or a particular election result. Sports events specifically impact, for example, vendors who sell event- or team-branded merchandise and broadcasters who promote and air the events themselves. The event contracts OG offers provide a means to hedge against the commercial risks of the underlying sports events, just like any other derivatives contract does. Event contracts are thus "swaps" traded on a "contract market designated pursuant to section 7" of the CEA, putting them squarely under the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). *See Kalshi v. Flaherty*, 172 F.4th at 229 ("[T]he Act grants the CFTC exclusive jurisdiction over 'swaps . . . traded or executed on a [DCM],' which includes Kalshi's sports-related event contracts." (alterations in original)); *Kalshi v. Johnson*, 2026 WL 1223373, at *5 ("[T]he Court finds that event contracts traded on DCMs are swaps within the meaning of 7 U.S.C. § 1a(47)(A).'"). Section 2 of the CEA expressly preempts states from asserting their authority to regulate these contracts.

**B.    New York's Sports Wagering Laws Are Field Preempted as Applied to OG**

Even if express preemption did not apply, field preemption does. Field preemption is implied "[w]hen the federal government completely occupies a given field or an identifiable portion of it." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212–13 (1983). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

11

Congress's intent to occupy a field can be expressed in a statute's text and legislative history, *see e.g.*, *Pac. Gas & Elec. Co.*, 461 U.S. at 203–13, or in a scheme of "federal statutory directives" that "provide a full set of standards" that are "designed as a 'harmonious whole,'" *Arizona*, 567 U.S. at 401. "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* The CEA's text and legislative history, as well as the comprehensive nature of its regulatory framework, illustrate Congress's clear intent to occupy the field of derivatives trading on federally designated contract markets. *See Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982) ("The pervasive regulatory scheme established under the Commodity Exchange Act has preempted the field insofar as futures regulation is concerned.").

**Statutory Text.** The same provisions discussed with respect to express preemption demonstrate Congress's intent to preempt the field of derivatives traded under CFTC oversight. It could not be clearer—Section 2 affords "exclusive jurisdiction" to the CFTC over derivatives traded on a DCM. 7 U.S.C. § 2(a)(1)(A). Indeed, the Third Circuit has recognized the preemptive effect of the CEA on state gaming law as applied to sports event contracts traded on DCMs. *See Kalshi v. Flaherty*, 172 F.4th at 228-230.

The Third Circuit's decision is consistent with those of numerous courts that have recognized that the CEA preempts state and local laws as applied to derivatives trading on DCMs. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (finding CEA "preempts the application of state law" to futures trading); *see also DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *4 (S.D.N.Y. Oct. 17, 2002) ("'Congress' intent to bring the markets under a uniform set of regulations' followed from a fear that states might attempt to regulate futures markets themselves and thus 'subject [] the national futures trading apparatus to conflicting regulatory demands.'" (alterations in original)); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (state statute field

12

preempted where it "would conflict with the objectives of the federal statutes and interfere with the stated federal purpose of fostering the commodity markets"); *Sinclair & Co. v. Gurule*, 757 P.2d 225, 228 (Idaho Ct. App. 1988) (declining to find commodity futures contracts unenforceable as gambling under state law because, "with passage of the CEA, the federal government has moved to occupy the entire field of commodities futures traded on federally regulated exchanges" and "a state should not treat commodity transactions as 'gambling' because such treatment could destroy the market").

**Statutory Purpose.**  The text of the CEA, as amended in 1974, comports with Congress's purpose of regulating the expanding commodity futures market with a uniform set of federal regulations. The 1974 amendments were intended to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  Congress wanted to avoid overlap with the Securities and Exchange Commission and was concerned that states might "step in to regulate the futures markets themselves" and introduce "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  Congress addressed these concerns by putting "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  Indeed, one sponsor of the 1974 amendments lamented that the application of "different state laws would just lead to total chaos."  Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

Courts nationwide have agreed that the whole point of the CEA's exclusive jurisdiction provision was to preempt parallel state regulation.  *See Kalshi v. Flaherty*, 172 F.4th at 230 ("Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC."); *Kalshi v. Johnson*, 2026 WL 1223373, at *7 ("[T]he CEA preempts the regulation of trading in swaps on CFTC-registered DCMs."); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated

13

intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established, however, that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions . . . and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC." (citations omitted)); *Int'l Trading Ltd. v. Bell*, 556 S.W.2d 420, 423 (Ark. 1977) (finding CEA's language "express[es] a clear intention to vest exclusive jurisdiction of the regulation of commodity options in the [CFTC] and to supersede the jurisdiction of all state and federal agencies"); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983) (noting that "the primary concern of Congress was preemption of federal and state regulatory schemes"). Attempting to preclude trading of event contracts on OG, a CFTC-regulated DCM, directly contradicts this clear purpose.

**Legislative History.**  If the text and purpose were not enough, the CEA's legislative history crystallizes congressional intent to occupy the field of CFTC-regulated derivatives.  The CEA's 1974 amendments introduced the exclusive jurisdiction provision.  The Conference Report that preceded the enactment of those amendments elucidates its purpose: "Under the exclusive grant of jurisdiction to the Commission, the authority of the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned.*"  S. Rep. No. 93-1194, at 35 (1974) (Conf. Rep.) (emphasis added).

The drafting history of the 1974 amendments eliminates any doubt of Congress's preemptive purpose.  At that time, Congress deleted a provision that would have preserved the states' authority over derivatives trading on federally designated contract markets.  *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687–88 (1982); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  The Senate made this deletion and clarified

14

that "the [CFTC's] jurisdiction, where applicable supersedes State as well as Federal agencies."  S. Rep. No. 93-1131, at 5848 (1974).  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987).  The Senate's deliberate deletion of the provision for concurrent state jurisdiction is an unmistakable indication of Congress's intent to preempt parallel state regulation.

**Comprehensive Regulatory Scheme.**  The CEA's comprehensive regulatory framework, including its enforcement provisions, confirms Congress's intent to occupy the field exclusively.  The CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).  Congress establishes such comprehensive structures when it means to leave "no room for the states to supplement federal law."  *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368–69 (1986); *see also Arizona*, 567 U.S. at 401 (explaining that a federal scheme's "comprehensive" nature supports field preemption).  An exchange may offer derivatives only after obtaining CFTC designation as a regulated exchange.  *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).  To receive this designation, the exchange must submit a detailed application demonstrating its ability to comply with the CFTC's extensive regulatory requirements.  17 C.F.R. § 38.3(a).  The CFTC then conducts a thorough review of the application to determine whether the exchange satisfies its standards.  *See id.*

Once designated as a federally regulated contract market, a DCM is governed by the CFTC's far-reaching regulatory scheme, which includes, among other requirements, recordkeeping obligations, 17 C.F.R. § 38.950, reporting requirements, *id.* § 38.450, and liquidity standards, *id.* § 38.1101(a)(2).  Congress also authorized CFTC-designated exchanges to list contracts—including event contracts—

15

through a certification process, whereby the exchange affirms that the contract complies with the CEA. Congress granted the CFTC authority to conduct a post-certification review if it believes the contract may violate any applicable statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). To keep its designation, a DCM must comply with all Core Principles and CFTC regulations. 7 U.S.C. § 7(d). If an exchange disregards a CFTC regulation, the Commission may pursue civil and criminal penalties. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.

Importantly, the CEA expressly permits the CFTC to reject event contracts that it finds "contrary to the public interest" if they "involve" conduct such as "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or other comparable conduct identified by the CFTC through rule or regulation. 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute provides that the CFTC "may"—not must—find a contract contrary to the public interest if it falls into one of the listed categories. *Id.* That judgment is assigned to the CFTC alone—not to Defendants and their counterparts in 49 other states. Indeed, the CFTC has brought numerous actions to defend its exclusive jurisdiction over products traded on DCMs. *See United States & CFTC v. New York.*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. New Mexico*, No. 26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Arizona*, No. 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), *consolidated with KalshiEX LLC v. Johnson et al.*, No. 2:26-cv-01715 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026). The CFTC has also submitted briefs as an amicus curiae supporting an action brought by OG's predecessor against state regulators in Nevada and an action brought by another DCM, KalshiEX, LLC ("Kalshi"), against state regulators in Ohio. Brief for CFTC as Amicus Curiae

16

Supporting Appellant, *N. Am. Derivatives Exch. Inc. v. Nevada.*, No. 25-7187 (9th Cir. Feb. 17, 2026) (ECF No. 38); Brief for CFTC as Amicus Curiae Supporting Appellant, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026) (ECF No. 31). The CFTC has also issued several Notices of Proposed Rulemaking Relating to Prediction Markets explaining, for example, that event contracts are "swaps" under the CEA. (*See* Compl. ¶ 42.) Cumulatively, this elaborate regulatory structure demonstrates Congress's intent to occupy the field of futures contracts on federally designated exchanges.

Individually, and in the aggregate, the CEA's text, history, purpose, and comprehensive structure demonstrate that Congress intended to occupy the field of derivatives traded on federally designated contract markets. As a result, New York's gaming laws are field preempted as applied to OG's event contracts.

**C.      New York's Gaming Laws Are Conflict Preempted as Applied to OG**

In the face of an imminent enforcement action, OG is functionally required to take one of two options: either permanently stop offering trading of event contracts in New York or stop offering them until OG obtains a sports wagering license under New York law. Either option would directly conflict with the congressional objectives underlying the CEA and would put OG at odds with specific regulatory requirements for operating a DCM. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress."); *see also Kalshi v. Flaherty*, 172 F.4th at 229 ("Conflict preemption 'occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.'"). Application of New York's licensing regulations

17

to the event contracts at issue here would frustrate congressional purposes of uniformity of regulation and enforcement as applied to derivatives traded under CFTC oversight, as well as furtherance of the CFTC's Core Principles, and would jeopardize OG's designation as a DCM.

*First*, application of New York's licensing regulations to OG would frustrate the CEA's purpose of bringing futures markets "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156. As the Seventh Circuit noted, "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The assertion of state authority cannot be squared with Congress's intent to shield regulated exchanges from being governed by a patchwork of potentially conflicting legal regimes. New York's interpretation of its gambling laws effectively subjects a CFTC-regulated DCM to the state's licensure scheme—precisely the type of regulation Congress intended to preclude. The inconsistency becomes even more apparent when considering that each of the other 49 states and the District of Columbia could likewise attempt to impose their own laws on OG. Subjecting DCMs to state regulation would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidovitz*, 312 U.S. 52, 67 (1941). These state laws are therefore preempted.

*Second*, subjecting OG to New York's licensing regulations would frustrate Congress's intended uniformity of enforcement for DCMs. Preemption also arises where there is "a conflict in the method of enforcement." *Arizona*, 567 U.S. at 406. A state law creates an "obstacle" to a federal regulatory framework when Congress adopts a particular method of enforcement to achieve its objectives, and state law imposes a different approach that disrupts "the careful balance struck by Congress." *Id.* This is especially true when Congress explicitly confers "enforcement power to the federal agency," *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 120 (2d Cir. 2018), such that the state law allowing prosecutions for the same conduct "is an obstacle to the regulatory system Congress chose." *Arizona*, 567 U.S. at 406.

18

Otherwise, as the Supreme Court cautioned, a state could initiate charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is precisely the danger here. Once OG received CFTC designation as a contract market, it was permitted under federal law to list event contracts by certifying those contracts that comply with federal requirements. The CFTC—and no other body—has the authority to review that certification on the basis that the contracts are "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i). If the CFTC determines that OG has violated federal law, it may act. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3. Congress provided the CFTC with a range of enforcement tools and vested the agency with discretion to determine how best to deploy them.

Allowing New York to impose its own laws on federally regulated exchanges would "stand[] as an obstacle" to Congress's objectives. *See Kalshi v. Flaherty*, 172 F.4th at 230 (state law obstacle where "state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts in New Jersey. This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC."); *see also Arizona*, 567 U.S. at 402 ("[A]uthorizing state . . . officers to engage in these enforcement activities . . . creates an obstacle to the full purposes and objectives of Congress."). For example, in the complaints filed against Gemini and Coinbase, the New York Attorney General alleges that the federally regulated markets are liable under Executive Law § 63(12) for repeated violations of New York State Constitution Article 1, § 9 and the Federal Interstate Wire Act, 18 U.S.C. § 1084(a). (Compl. ¶ 97.) The New York Attorney General further asserts violations of New York Penal Law § 225.10 (promoting gambling in first degree), and New York Penal Law § 225.20 (possession of gambling records in the first degree)—class E felonies that can carry a prison term of four years, and significant fines under N.Y.

19

Penal Law §§ 70.00(2)(e) and 80.10(1). (*Id.*; *see also id.* (listing alleged violations of New York's Racing Law (§ 1367-a) that "carry civil penalties of up to $100,000 for each violation, not to exceed $5,000,000 for violations arising out of the same transaction or occurrence").)

If there were no preemption here, Congress's federal enforcement regime would be frustrated by state-imposed civil and criminal sanctions. *See Crosby*, 530 U.S. at 373–74 (finding conflict preemption where state law "undermin[ed]" Congress's "delegation of effective discretion" to the executive). Courts have recognized conflict preemption where state discipline and enforcement regimes diverge from the federal scheme. For example, the Sixth Circuit held that the CEA preempted an Ohio statute that required payment to investors of any interest earned on collateral because it conflicted with CFTC regulation. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998). Similarly, the Seventh Circuit held that the CEA preempted a state law defamation claim against a registered futures association because the CEA regulates in a "comprehensive way" the "disciplinary proceedings" by self-regulated organizations and a state common-law challenge to those proceedings would "impair[ ] significantly" such an organization's "capacity to discipline its members." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893–94 (7th Cir. 2019).

*Third*, Defendants' position is at odds with the CFTC Core Principles that underpin OG's status as a DCM. Core Principle 2 requires OG to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added); *id.* § 38.150. Evicting users from the contract market and terminating their contracts based on their location within New York would not be providing "impartial access." Under Core Principle 4, OG must "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." 17 C.F.R § 38.255; *id.* § 38.250. Abruptly cutting off New York residents—including those holding ongoing investments—from OG's event contracts would

20

constitute exactly the sort of disruption the CFTC requires OG to prevent.  In contemplating such a disruption, the Seventh Circuit emphasized that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted."  *Am. Agric. Movement*, 977 F.2d at 1156–57 (citation omitted).  In this scenario, it may be "impossible for [OG] to comply with both state and federal requirements"—the quintessential case for conflict preemption.  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

Many courts have extended these principles to find state laws conflict preempted by the CEA. *See DGM Invs.*, 2002 WL 31356362, at *5 ("When application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." (citation omitted)); *Am. Agric. Movement*, 977 F.2d at 1156–57 (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (affirming dismissal of a claim that trading in futures contracts violated a Georgia gambling statute "on the ground that the [CEA] preempts all state laws inconsistent with its provisions"); *Paine, Webber*, 515 F. Supp. at 207 (state law preempted where application of state's gambling laws "would destroy the markets in this state"); *Sinclair & Co.*, 757 P.2d at 228 (holding the application of state's gambling laws to federally regulated exchanges "could destroy the market."); *see also Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055–57 (9th Cir. 2003) (finding CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA).

Because imposing New York's licensing regulations on OG would frustrate the purpose and effect of the CEA's uniformity of regulation, uniformity of enforcement, and furtherance of the CFTC's

21

Core Principles, those laws are conflict preempted.

## II.    OG WILL SUFFER IRREPARABLE HARM IF THE REQUESTED RELIEF IS NOT GRANTED

Absent an injunction, OG will be forced to decide between: (1) risking imposition of unlawful civil and criminal penalties; or (2) complying with preempted state law.  Either way, OG will be irreparably harmed.  A court may find irreparable harm when monetary damages are an inadequate remedy.  *See Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) ("To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages.").  Here, costs associated with unlawful penalties and complying with preempted state law would be unrecoverable because of Defendants' sovereign immunity.  *See Ex parte Young*, 209 U.S. 123, 155 (1908); *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 1989); *United States v. New York*, 708 F.2d 92, 93–94 (2d Cir. 1983) (per curiam) (holding that where recovery of pecuniary losses is barred under the Eleventh Amendment, irreparable harm is present); *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009) ("Plaintiff is unable to collect a judgment for monetary damages in this action because Defendant is a state official entitled to sovereign immunity under the Eleventh Amendment.  Thus, . . . irreparable harm may be presumed here because the only relief available . . . is injunctive.").

### A.    OG Will Suffer Irreparable Harm Absent Preliminary Relief

OG will suffer irreparable harm if it does not comply with New York's licensing regulations that are preempted by federal law.

*First*, as the Supreme Court has recognized, a plaintiff establishes irreparable harm when it demonstrates a credible threat of "imminent" enforcement of a preempted state law.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992) ("[T]he [imminent] prospect of state suit . . . supplies the necessary irreparable injury."); *see also Kalshi v. Johnson*, 2026 WL 12233735, at *9 ("The

22

State's continued prosecution of DCM operators inflicts the injury . . . recognized as grounds for preliminary injunctive relief, the enforcement of preempted state law."). Here, the imminent enforcement of New York's gambling laws has been demonstrated via the New York Attorney General's enforcement actions filed against Gemini and Coinbase.

*Second*, the business costs faced by OG in trying to operate in New York are monumental. Indeed, OG faces the imminent threat of criminal and civil prosecution by Defendants if it does not comply with New York's interpretation of its licensing requirements. Critically, the purported violations of New York law carry penalties including significant fines and incarceration. (*See* Compl. ¶ 97.) This irreparable injury is particularly significant, where, as here, "repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses." *Morales*, 504 U.S. at 381. In these circumstances, litigants are faced with a "Hobson's choice: continually violate the [state] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Id.* The threat of imminent enforcement of preempted New York state statutes force OG to make this "Hobson's choice."

B.    **OG Will Suffer Irreparable Harm if It Complies with Preempted New York Statutes**

OG will also suffer irreparable harm if it complies with the preempted statutes—if compliance is even possible.

*First*, to cease offering event contracts in New York, OG would need to identify users in New York and exclude them from its market. Doing so would subject OG (and its users) to severe interruptions in service, which would threaten OG's financial and operational future. Indeed, OG does not restrict users' access to the market or particular contracts based on location. Rather, because OG is a national exchange, it has no need to identify the geographical location of any individual user at a

23

particular time. To comply with the preempted statutes, OG would have to implement expensive technology necessary to monitor real-time geolocation information—technology that OG has no need to, and does not, maintain or deploy. (*See* Declaration of Scott Kallback ("Kallback Decl.") ¶¶ 11–23 (detailing how developing this technology would subject OG to significant challenges and would take significant time, making immediate compliance infeasible).) Requiring substantial expenses to comply with a state law that OG is challenging as preempted supports a showing of irreparable harm.

*Second*, unwarranted compliance with New York's licensing regulations also poses an existential threat to OG because compliance would jeopardize OG's status as a DCM. Terminating existing contracts in New York would violate CFTC Core Principles requiring exchange markets to provide "impartial access" to markets, 17 C.F.R. § 38.151(b), and prevent "market disruptions," 17 C.F.R. § 38.255. (*See* Kallback Decl. ¶¶ 24-28.) As described above, compliance with New York's interpretation of its licensing requirements would require OG to *cause* the very market disruption it must prevent—as well as impede OG's responsibility to provide impartial access to its markets. These violations of CFTC Core Principles could cause OG to lose its CFTC designation as a DCM, putting its entire business in jeopardy. *See* 17 C.F.R. § 38.100(a) (requiring compliance with Core Principles to "maintain" designation as a contract exchange). In addition, OG could be subject to significant civil penalties, further adding to the harm OG would incur absent an injunction. *See* 7 U.S.C. §§ 13a, 13a-1(d). This potential for devastating harm to OG's business further supports a finding of irreparable harm. *See Kalshi v. Flaherty*, 172 F.4th at 231 ("The District Court did not abuse its discretion when it held that, absent injunctive relief, Kalshi would suffer economic and reputational harm, including loss of business and goodwill."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming district court where defendant's actions would cause plaintiff "irreparable harm through loss of reputation, good will, and business opportunities").

**III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT ENJOINING ENFORCEMENT OF NEW YORK'S GAMING LAWS**

The other preliminary injunction elements likewise support OG's requested relief because the public interest and the harm to OG from denying the injunction outweigh any potential harm to Defendants from granting the injunction. *See Amarin Pharma, Inc. v. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) (enjoining unconstitutional application of statute "serves the public interest . . . because . . . the Government does not have an interest in the unconstitutional enforcement of a law").

Compliance with the preempted statutes would cause significant harms to the public, particularly OG's users. Indeed, OG would be forced to pause or liquidate numerous users' positions in event contracts. (*See* Kallback Decl. ¶¶ 17-23.) A substantial number of investors exiting the event contract market simultaneously could distort contract prices and send a false signal to other investors, setting off market disruption. (*See id.* ¶¶ 23–27.) The CFTC requires OG to prevent this sort of market disruption, as it is contrary to the CFTC's interest in "safeguarding the public interest in commodity futures markets." *CFTC v. Brit. Am. Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977). Further, New York users would be barred from responding to market fluctuations and denied the flexibility they relied on in investing in an event contract position traded on OG's DCM. (*See* Kallback Decl. ¶¶ 17–23, 27.) These negative effects on OG's users would also cause substantial harm to OG's reputation. (*Id.* ¶¶ 29–31.)

The financial, reputational, and potential legal harms OG would face in the absence of a preliminary injunction (*supra* § II) are exactly the kinds of harms that tip the balance of equities in favor of issuing an injunction. *See Kalshi v. Flaherty*, 172 F.4th at 232 ("If the Act preempts New Jersey law, then the public interest is best served by enforcing the Act."); *Kalshi v. Johnson*, 2026 WL 1223373, at *9 ("There is also a substantial public interest in the enforcement of valid federal law."). Here too, the harms faced by OG are significant and even existential, while any purported harms faced by Defendants would be negligible or nonexistent.

25

## IV.    NO SECURITY OR AT MOST *DE MINIMIS* SECURITY IS APPROPRIATE

Rule 65(c) of the Federal Rules of Civil Procedure requires a party seeking a preliminary injunction to post "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Defendants will suffer no compensable costs or damages by halting enforcement of New York's gaming laws against OG during the pendency of this litigation. *See id.* (affirming the district court properly dispensed with the filing of a bond). As a result, no security is needed. If this Court elects to require a security, it should set it at a nominal amount.

## CONCLUSION

OG respectfully requests that the Court grant a preliminary injunction.

Dated: New York, New York          Respectfully submitted,
      June 22, 2026

/s/ *Robert A. Fumerton*
David Meister
Robert A. Fumerton
Judith A. Flumenbaum
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
david.meister@skadden.com
robert.fumerton@skadden.com
judy.flumenbaum@skadden.com

Shay Dvoretzky (*pro hac vice* forthcoming)
Parker Rider-Longmaid (*pro hac vice* forthcoming)
Sylvia O. Tsakos (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
shay.dvoretzky@skadden.com
parker.rider-longmaid@skadden.com
sylvia.tsakos@skadden.com

*Attorneys for North American Derivatives Exchange, Inc., d/b/a OG*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND LOCAL RULE 7.1**

Undersigned counsel certifies that this Memorandum of Law complies with the Individual Practices' and Local Rules' limit of 8,750 words as it contains 8,596 words of text according to the undersigned's Microsoft Word count function.

 */s/ Robert A. Fumerton*
Robert A. Fumerton