UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.,
d/b/a OG,

<em>Plaintiff</em>,

v.

LETITIA JAMES, *in her official capacity as Attorney General of New York*; ROBERT WILLIAMS, *in his official capacity as Executive Director of the New York State Gaming Commission*; BRIAN O'DWYER, *in his official capacity as Chair and Commissioner of the New York State Gaming Commission*; JOHN A. CROTTY, *in his official capacity as Commissioner of the New York State Gaming Commission*; SYLVIA B. HAMER, *in her official capacity as Commissioner of the New York State Gaming Commission*; MARTIN J. MACK, *in his official capacity as Commissioner of the New York State Gaming Commission*; PETER J. MOSCHETTI, JR., *in his official capacity as Commissioner of the New York State Gaming Commission*; MARISSA SHORENSTEIN, *in her official capacity as Commissioner of the New York State Gaming Commission*; JERRY SKURNIK, *in his official capacity as Commissioner of the New York State Gaming Commission;* NEW YORK STATE GAMING COMMISSION,

<em>Defendants</em>.

1:26-cv-04980-VM

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

Katherine Rhodes Janofsky
Robert Arnay
Zachary Manley
Assistant Attorneys General
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND.................................................. 3

    I.    NEW YORK'S HISTORY OF POLICING GAMBLING................................................ 3

    II.    FEDERAL REGULATION OF COMMODITY FUTURES TRADING......................... 4

RELEVANT FACTS AND PROCEDURAL HISTORY ............................................... 6

    A.    In December 2024, Plaintiff began offering sports "event-contracts" through its "Crypto.com" platform, but did not provide such "services" in New York. ..................... 6

    B.    By December 2025, Plaintiff had "pulled" its sports offerings from eight states.............. 7

    C.    Plaintiff launches its new "OG" platform for event-contracts in February 2026. ............. 8

    D.    Plaintiff alleges it began offering its "OG" platform to "New York residents" on June 12, 2026  and sued Defendants the same day. ........................................... 10

LEGAL STANDARD.................................................................................................... 10

ARGUMENT ................................................................................................................. 11

    I.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS 11

        A.    Gaming Commission Has Eleventh Amendment Immunity. ....................................... 11

        B.    The Event-Contracts At Issue Are Not "Swaps" Under The CEA. ............................... 11

            i.    Applicable Rules Of Statutory Construction ......................................................... 12

            ii.    Plaintiff's "Event Contracts" Are Not "Swaps" Under Section 1a(47)(A)(ii) ..... 12

                a.    Interpreting Section 1a(47)(A)(ii) ................................................................... 13

                b.    Applying Section 1a(47)(A)(ii).......................................................................... 18

            iii.    Even If The Event Contracts Are "Swaps," the CEA Does Not Preempt New York Laws ............................................................................................. 20

                a. The CEA Does Not Expressly Preempt New York Law. ................................ 20

                b. The CEA Does Not Field-Preempt New York Law. ....................................... 21

                c. The CEA Does Not Conflict-Preempt New York Law...................................... 25

    II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM........ 28

    III.    THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION ...................... 32

    IV.    THE COURT SHOULD IMPOSE A BOND .................................................................. 33

CONCLUSION.............................................................................................................. 34

# TABLE OF AUTHORITIES

CASES PAGE(S)

*Abbott v. Perez*,
585 U.S. 579, 602 n.17 (2018)................................................................................................32

*Ah Sin v. Wittman*,
198 U.S. 500 (1905)................................................................................................................22

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021)................................................................................................................17

*Altria Grp., v. Good*,
555 U.S. 70 (2008)..................................................................................................................20

*Am. Agric. Movement v. Board of Trade of City of Chicago*,
977 F.2d 1147, 1156 (7th Cir. 1992) ......................................................................................25

*Am. Petroleum Inst. v. Jorling*,
710 F. Supp. 421, 431 (N.D.N.Y. 1989)..................................................................................29

*Arizona v. United States*,
567 U.S. 387 (2012)................................................................................................................27

*Art & Antique Dealers League of Am. v. Seggos*,
121 F.4th 423 (2d Cir. 2024) ...........................................................................................12, 26

*Ass'n of Int'l Auto. Mfrs. v. Abrams*,
84 F.3d 602 (2d Cir.1996).......................................................................................................20

*Bond v. United States*,
572 U.S. 844 (2014)................................................................................................................17

*Cayuga Nation v. N.Y. State Gaming Comm'n*,
775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) ...........................................................................11

*Chan v. U.S. Dep't of Trans.*,
23-cv-10365, 2024 WL 5199945, (S.D.N.Y. Dec. 23, 2024) .................................................29

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .................................................................................................24

*Coal. for Competitive Elec., Dynegy v. Zibelman*,
272 F. Supp. 3d 554 (S.D.N.Y. 2017)......................................................................................23

*Commonwealth v. KalshiEX*,
2026 WL 188019, (Mass. Super. Ct. Jan. 20, 2026) .........................................................31, 33

*Convergen Energy WI v. L'Anse Warden Electric*,
　2020 WL 5894079, at \*5 (S.D.N.Y. Oct. 5, 2020) ...............................................................31

*Council for Responsible Nutrition v. James*,
　159 F.4th 155, 171–72 (2d Cir. 2025) ..................................................................... 30, 31-32

*Davis v. Mich. Dept. of Treasury*,
　489 U.S. 803 (1989)..............................................................................................................12

*De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*,
　520 U.S. 806 (1997)..............................................................................................................20

*Dubin v. United States*,
　599 U.S. 110 (2023)..............................................................................................................15

*Effex Cap. v. Nat'l Futures Ass'n,*
　933 F.3d 882, 894 (7th Cir. 2019) ........................................................................................25

*Epic Sys. v. Lewis*,
　584 U.S. 497 (2018)..............................................................................................................17

*Ex Parte Young*,
　209 U.S. 123, 150–59 (1908) ...............................................................................................11

*Freedom Holdings v. Spitzer*,
　408 F.3d 112, 114–15 (2d Cir. 2005) ...................................................................................32

*Figueroa v. Foster*,
　864 F.3d 222 (2d Cir. 2017)............................................................................................25, 26

*Greater New Orleans Broad. Ass'n v. United States,*
　527 U.S. 173, 187 (1999)......................................................................................................16

*Horn v. Med. Marijuana*,
　80 F.4th 130 (2d Cir. 2023) ..................................................................................................14

*Hughes v. Talen Energy Mktg.,*
　578 U.S. 150, 167 (2016)......................................................................................................23

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
　725 F.3d 65 (2d Cir. 2013)...............................................................................................25, 26

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
　959 F3d 1201, 1224 (9th Cir 2020) ......................................................................................27

*Inv. Co. Inst. v. CFTC*,
　720 F.3d 370 (D.C. Cir. 2013)................................................................................................4

iv

*KalshiEX v. Flaherty*,
2025 WL 1218313, (D.N.J. Apr. 28, 2025) ...........................................................................33

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .....................................................2, 19, 22, 24, 25, 27

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. 2026)..........................................................................8, 19, 24

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ................................................................. passim

*KalshiEX LLC v. Orgel*,
26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)....................................13, 19, 24

*KalshiEX, LLC v. Schuler*,
25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ............................................... passim

*KalshiEX LLC v. Schuler*,
26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)...................................................... passim

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025)............................................................... passim

*KalshiEX  v. Williams*,
No. 25-cv-8846, 2026 WL 1961872 *as amended by* 2026 WL 2017466 (S.D.N.Y.
July 13, 2026) ..................................................................................................... *passim*

*Kansas v. Garcia*,
589 U.S. 191, 208 (2020)....................................................................................24, 27

*Kane v. Johns-Manville Corp.*,
843 F.2d 636, 643 (2d Cir. 1988).....................................................................................30

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369, 391 (2024)...................................................................................................12

*Medtronic v. Lohr*,
518 U.S. 470 (1996)................................................................................... 20, 21-22

*Merrill Lynch, Pierce, Fenner, & Smith v. Curran*,
456 U.S. 353 (1982)..................................................................................................4, 12

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025)...................................................................................6

*Morales v. Trans World Airlines*,
504 U.S. 374 (1992)...............................................................................................29

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010)..........................................................................................6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)...............................................................................3, 16, 22

*N. Am. Derivatives Exchange v. Nevada*,
815 F. Supp. 3d 1169 (D. Nev. 2025)...................................................2, 8, 12, 13

*N. Am. Soccer League v. U.S. Soccer Fed'n*,
883 F.3d 32 (2d Cir. 2018)........................................................................................11

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213, 249 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No.
25-566, 2026 WL 1871312 (U.S. June 30, 2026)....................................................32

*N.Y. SMSA v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010)........................................................................................20

*N.Y. State Firearms Ass'n v. James*,
157 F.4th 232 (2d Cir. 2025) .............................................................................10, 11

*N.Y. State Telecomms. Ass'n. v. James*,
101 F.4th 135 (2d Cir. 2024) .............................................................................21

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025) .............................................................................12

*Oneok v. Learjet*,
575 US 373 (2015).................................................................................................24

*Our Wicked Lady v. Cuomo*,
2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) ...................................................32

*Pletcher v. N.Y. State Gaming Comm'n*,
249 A.D.3d 1290 (3d Dep't 2026)........................................................................29

*QCX LLC v. Nessel*,
1:26-CV-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026).................................... passim

*Saratoga Cnty. Chamber of Commerce v. Pataki*,
798 N.E.2d 1047 (N.Y. 2003)..................................................................................3

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ...................................................................................28

*Tom Doherty Assocs. v. Saban Ent.*,
60 F.3d 27, 38 (2d Cir. 1995)..................................................................................31

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012). (Mem. 19–21.) .................................................33

*United States v. California*,
2026 WL 784514 (C.D. Cal. 2026)......................................................................33

*United States v. Harris*,
838 F.3d 98 (2d Cir. 2016)...................................................................................16

*United States v. Miller*,
604 U.S. 518 (2025)..............................................................................................15

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ................................................................................12

*Walden v. Kosinski*,
153 F.4th 118 (2d Cir. 2025) ................................................................................10

*We The Patriots USA v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ................................................................ 11, 28-29, 32

*West Virginia v. EPA*,
597 U.S. 697 (2022)..............................................................................................17

*Whitman v. Am. Trucking Associations*,
531 U.S. 457 (2001)..............................................................................................17

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7, 20 (2008)............................................................................................11

**STATE STATUTES**

N.Y. Executive Law
§63(12).................................................................................................................27

N.Y. Penal Law
§225.00(4)..............................................................................................................4
§225.00(5)..............................................................................................................4
§225.05..............................................................................................................1, 4
§225.10..............................................................................................................1, 4
§225.15..............................................................................................................1, 4
§225.20..............................................................................................................1, 4
§225.30..............................................................................................................1, 4

N.Y. Racing, Pari-Mutuel Wagering and Breeding Law
  Art. 13, titles 3–8 ...................................................................................................4
  §1367.............................................................................................................1, 3
  §1367(1)(s)........................................................................................................32
  §1367-a ...............................................................................................................4
  §1367-a(4)(a)(xi)................................................................................................32
  §1367-a(4)(e) .....................................................................................................32

**FEDERAL STATUTES**

7 U.S.C.
  §1a(19) ................................................................................................................5
  §1a(47)(A)(i).................................................................................................22-23
  §1a(47)(A)(ii)................................................................................................ passim
  §1a(47)(A)(i)–(vi) ..............................................................................................15
  §2........................................................................................................................4
  §2(a)(1)(A) .................................................................................................. passim
  §2(e) ...............................................................................................................4, 16
  §5...................................................................................................................5, 20
  §6........................................................................................................................4
  §7a-2(c) .....................................................................................................4, 5, 28
  §8(b)..................................................................................................................30
  §16(e) ...........................................................................................5, 21, 23, 25
  §16(h)...........................................................................................................5, 25

15 U.S.C.
  §3001(a)(1) ........................................................................................................16
  §1178.................................................................................................................16

18 U.S.C.
  §1084.............................................................................................................1, 16
  §1952–1953........................................................................................................16
  §1955.................................................................................................................16

31 U.S.C.
  §5362–5363........................................................................................................16

28 U.S.C.
  §3702 *et seq.* .......................................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. 111-203, July 21, 2010, 124 Stat 1376...........................................................4

## STATE REGULATIONS

9 NYCRR

Parts 5329–5330...........................................................................................................3

§5330.8..........................................................................................................................32

§5330.13.........................................................................................................................33

§5330.19.........................................................................................................................32

§5330.10(d)(5) ...............................................................................................................32

§5330.34.........................................................................................................................32

§5330.34.........................................................................................................................32

§5324.42(o) ...................................................................................................................23

## FEDERAL REGULATIONS

17 C.F.R.

§38.151(b)......................................................................................................................27

§38.150...........................................................................................................................27

§40.11(a) .....................................................................................................................5, 7

91 Fed. Reg. 35,806 .........................................................................................................5

## RULES

Fed. R. Civ. Pro. 65(c) ..................................................................................................33

## OTHER AUTHORITIES

56 Cong. Rec. S5902-01 .................................................................................................18

New Oxford American Dictionary, 2d Edition (2005) ....................................................14

Defendants New York State Attorney General Letitia James ("AG"), the New York State Gaming Commission ("Gaming Commission") and its various official-capacity defendants respectfully submit this memorandum of law and accompanying Declaration of Katherine Rhodes Janofsky ("Decl."), in opposition to the preliminary injunction motion by Plaintiff North American Derivatives Exchange Inc., d/b/a OG ("Plaintiff" or "CDNA" or "Nadex").[1]

## PRELIMINARY STATEMENT

At a time when so-called "prediction markets" are being enjoined from offering their unlawful gambling services all over the country, and having ceased its own services in other states in connection with enforcement actions concerning its "Crypto.com" platform, on June 12, 2026, Plaintiff announced that it was expanding its "OG" platform to offer unlicensed gambling to New York residents. Seeking to end-run the legitimate, lawful exercise of state authority over illegal gambling—exercises Congress *never* concluded ought to be preempted by the purported authority of a federal commodities agency—Plaintiff commenced this pre-enforcement action on the *same day* as this New York expansion, simultaneously self-proclaiming its own state law violations while asserting state enforcement is preempted by the Commodity Exchange Act ("CEA"). It is undeniable that Plaintiff's conduct harms New Yorkers. It is also undeniable that the sports, elections, and entertainment/culture "event-contracts" Plaintiff offers constitute gambling under New York law, and Plaintiff's conduct violates *at least* Article I, §9 of the New York State Constitution, New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") §§1367 and 1367-a, New York Penal Law §§225.05, 225.10, 225.15, 225.20, and the Wire Act, 18 U.S.C. §1084(a). To avoid potential enforcement, Plaintiff claims its wagers are "swaps" based on its own "self-certifications" to the Commodity Futures Trading Commission ("CFTC").

---

[1] Although Plaintiff calls itself "OG," Defendants use this shortform for reasons set forth *infra* 6, 8–9.

1

Plaintiff's arguments have been rejected by numerous courts, including the Sixth Circuit and five federal district courts—the Southern District of New York among them—ruling in favor of state regulators.[2]  The only circuit to rule otherwise issued a deeply flawed 2-1 decision that, as discussed *infra* 24–25, failed to interpret the CEA text with regard to usual canons of construction or the overall statutory scheme.[3]

The sweeping preliminary injunction Plaintiff seeks should be denied.

First, Plaintiff fails to demonstrate a clear and substantial likelihood of success.  The sports, elections, and entertainment/culture "event-contracts" Plaintiff puts at issue in this litigation do not fall within the definition of "swap" under the CEA.  Nowhere in its text or history is there any indication that Congress intended to use the CEA to become a vehicle for Plaintiff's unlicensed gambling operations—a major matter historically within the police power of the States.  CFTC therefore has no jurisdiction over such offerings.

Even if Plaintiff's offerings were "swaps," the CEA does not preempt the laws Plaintiff challenges.  Plaintiff's field-preemption argument has no support in the CEA's text, structure, context, or legislative history, nor the centuries-old history of New York gambling prohibitions.  Plaintiff's argument that its own self-certification of any product it labels a "swap" sanitizes its violations of state law should be rejected here, as it has been in other courts.  Plaintiff's conflict-

---

[2] *KalshiEX v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (dissolving preliminary injunction) ("*Hendrick II*") *appeal docketed*, No. 25-7516 (9th Cir. Nov. 28, 2025)*; N. Am. Derivatives Exchange, v. Nevada ex rel. Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025) ("*Crypto*") (denying preliminary injunction) *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025); *KalshiEX v. Williams*, No. 25-cv-8846, 2026 WL 1961872 *as amended by* 2026 WL 2017466 (S.D.N.Y. July 13, 2026) (same) appeal docketed No. 26-1835 ("*Williams*"); *KalshiEX v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (same), *appeal docketed* No. 25-1892 (4th Cir. Aug. 6, 2025); *QCX v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) (same); *KalshiEX v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ("*Schuler I*") (same) *appeal docketed*, No. 26-3196 (6th Cir. Mar. 11, 2026); and *KalshiEX v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) ("*Schuler II*") (denying injunction pending appeal).

[3] *KalshiEX v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).

2

preemption argument fails as well because Plaintiff can cite no provision rendering dual compliance with state and federal law impossible.

Next, Plaintiff's allegations of monetary damages, reputational loss, and other harms allegedly caused by Defendants do not satisfy irreparable harm or are entirely speculative, particularly where enforcement is proceeding against Plaintiff in other jurisdictions, and where Plaintiff claims it has ceased its offerings (or never had offerings) in at least nine states.

Finally, the equities strongly favor Defendants. The public harms of unregulated betting are well documented, particularly for younger New Yorkers and persons with gambling addictions; are detrimental to the integrity of sports, and more. An injunction would tie Defendants' hands from regulating gambling within state boundaries and allow Plaintiff to continue its unlicensed activities unchecked. Preliminary injunctive relief should be denied.

## STATUTORY AND REGULATORY BACKGROUND

### I.    NEW YORK'S HISTORY OF POLICING GAMBLING

New York has policed gambling since 1771. *Saratoga Cnty. Chamber of Commerce v. Pataki*, 798 N.E.2d 1047, 1063–65 (N.Y. 2003) (Smith, J., concurring in part). Gambling is prohibited under the New York State Constitution with limited exceptions. N.Y. Const., art. I, §9.

The 1992 Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. §3702 *et seq*., effectively banned commercial sports betting in most states, and was struck down in 2018. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). Racing Law §1367 then became effective in 2019, permitting authorized in-person sports wagering at commercial casinos. In 2021, Racing Law §1367-a authorized mobile sports wagering. Both forms of wagering are subject to New York's comprehensive statutory and regulatory regimes. *See generally* Racing Law Art. 13, titles 3–8; 9 NYCRR Parts 5329–5330. There is criminal liability for "promoting"

3

or "advancing" "gambling activity" under Penal Law §§225.00(4), 225.00(5), 225.05, 225.10, or possessing gambling records or devices, *id*. §§225.15, 225.20, 225.30.

## II.    FEDERAL REGULATION OF COMMODITY FUTURES TRADING

Derivatives are "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013).   Congress responded to concerns about price manipulation and other issues after World War I by authorizing federal regulation of commodity futures exchanges.  *Merrill Lynch, Pierce, Fenner, & Smith v. Curran,* 456 U.S. 353, 360–61 (1982).  *See also* 7 U.S.C. §5 (CEA findings and purpose).

Today, the CEA requires various instruments to be traded on CFTC-designated exchanges. 7 U.S.C. §§2, 6.  In 2000, the CEA was amended to allow designated contract markets ("DCMs") to list contracts without prior CFTC approval by "self-certifying" their contracts comply with applicable laws.  *Id*. §7a-2(c)(1).

Following the 2008 financial crisis, Congress increased oversight and reporting for swaps. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat 1376 (2010).  Jurisdiction over swaps was divided among CFTC and other regulators*.  Id*.  Subject to important limitations, CFTC was granted "exclusive jurisdiction…with respect to accounts, agreements…, and transactions involving swaps" that are "traded or executed" on DCMs.  *Id.* at 1672 (amending 7 U.S.C. §2(a)(1)(A)).  Congress defined "swap" under 7 U.S.C. §1a(47) and made it unlawful to enter into a "swap" with a retail customer unless it is traded on a DCM.  7 U.S.C. §§2(e); *see Nessel*, 2026 WL 1895958, at *3–4 (legislative history overview).

Section §2(a)(1)(A) also includes two savings clauses. The regulatory savings clause provides: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on … other regulatory authorities under the laws of… any State, or (II) restrict … such other authorities from carrying out their duties and responsibilities

4

in accordance with such laws." 7 U.S.C. §2(a)(1)(A). The jurisdictional savings clause provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id*.

The CEA also contains express preemption clauses. Tthe CEA supersedes "[s]tate or local law that prohibits or regulates gaming" *only for* certain limited derivatives (such as transactions in "security warrants," certain repurchase transactions, and certain banking products) not at issue here. *Id.* §16(e)(2). In addition, Section 16(h)(2) provides that a swap "may not be regulated as an insurance contract under the law of any State."

In the face of a DCM's ability to "self-certify" its listings, Congress enacted a special rule for so-called "event contracts," that is, swaps and other financial products in "excluded commodities" (which Plaintiff alleges encompass the offerings at issue here). *Id.* §7a-2(c)(5)(C) ("Special Rule"); §1a(19)(iv) (defining "excluded commodity").[4] Under the Special Rule, CFTC may determine that certain event contracts are contrary to the public interest and prohibit them from being listed, traded, and cleared on DCMs. *Id.* §7a-2(c)(5)(C)(i)–(ii) (identifying contracts involving "activity that is unlawful under any Federal or State law," "terrorism," and "gaming," among others, as "contrary to the public interest"). Moreover, CFTC regulations *outright prohibit* DCMs from listing event contracts related to any of these enumerated factors. 17 C.F.R. §40.11(a).[5]

---

[4] The definition of "excluded commodity" was added in 2000 and closely mirrors the language in the definition of "swap" at Section 1a(47)(A)(ii) added in 2010 at issue in this litigation.

[5] CFTC issued a purported notice of proposed rulemaking on June 12, 2026, to, among other things, amend §40.11. 91 Fed. Reg. 35,806 (June 12, 2026). Plaintiff has been, and continues to be, subject to this regulation in its current form.

## RELEVANT FACTS[6] AND PROCEDURAL HISTORY

**A.      In December 2024, Plaintiff began offering sports "event contracts" through its "Crypto.com" platform but did not provide such "services" in New York.**

Plaintiff became a DCM in 2004.  (Compl. ¶7.)  Several years ago, Plaintiff began using the d/b/a "Crypto.com."  (Decl. Ex. 1.)  In December 2024, Plaintiff announced plans to offer "sports event trading" as "an entirely new platform for U.S. users to engage nationwide at Crypto.com and in the Crypto.com app" (Decl. Ex. 2) and unambiguously advertised these offerings as recreational sports wagering:







*Screenshots of* "Introducing Crypto.com Sports," Dec 23, 2024, available at
https://www.youtube.com/watch?v=jfmCvxoUcJA

---

[6] Defendants cite documentary evidence that the Court may consider "in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *see also Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 649 n.38–42 (S.D.N.Y. 2025).  Citations to factual material will reference exhibits attached to the Janofsky Declaration.

Plaintiff self-certified "two sports contracts[.]" (Decl. Ex. 3.)  Despite this December 2024 roll-out, according to Plaintiff, none of its event-contracts were available to New York residents until June 12, 2026.  (Compl. ¶¶86–87.)  Plaintiff's website also states that the Crypto.com App is not available "*in* New York." (Decl. Exs. 4 and 5 (emphasis added).)  (It is unclear why some of Plaintiff's advertising suggested Crypto.com was available in all fifty states.)

On or about January 14, 2025, CFTC informed Plaintiff that it had "determined the contracts may involve an activity enumerated in" 17 C.F.R. §40.11(a) and the Special Rule.  (Decl. Ex. 6.)  CFTC requested Plaintiff "suspend any listing and trading" of the two sports contracts during the review period.  *Id.*  But Plaintiff "refused…to halt its sports event trading contracts [before] the Super Bowl." (Decl. Ex. 7; *see also* Ex. 8)  On January 30, 2025, and dates subsequent, Plaintiff submitted certifications concerning "event contracts" in "sports, economics, politics, technology, culture, and climate." (Compl. ¶85; ¶¶74–75.)  Sports offerings include not only the outcome of a game, for example, but also the margin of victory or how many passing yards a quarterback will have.  Customers can even combine bets into a "parlay" for a higher payout, just as sports bettors may do with state-licensed sports-gambling operators.  (Decl. Ex. 9.)  Plaintiff also offers "trading bonuses" the same way that casinos entice customers to gamble by offering credits.  (Decl. Ex. 10.)

**B.     By December 2025, Plaintiff had "pulled" its sports offerings from eight states.**

Around March 2025, numerous state gaming commissions began issuing cease-and-desist orders against "prediction markets" or commencing enforcement.  At present, Plaintiff is engaged

7

in litigations across the country.[7]  After Plaintiff lost a preliminary injunction motion against the Nevada Gaming Control Board in November 2025, asserting the same flawed preemption claim it makes here, *Crypto.com*, 815 F. Supp. 3d 1169, Plaintiff stopped offering sports event contracts to Nevada residents.  (Decl. Ex. 11.)  In addition, Plaintiff "pulled sport event contracts" from Arizona on December 2, 2025, and "the rest of its prediction markets" on December 12, 2025. (Decl. Ex. 12.)  As of that date, it reportedly also "no longer offers sport event contracts in Michigan, Maryland, Massachusetts, Illinois, New Jersey, Nevada, and Ohio.  It also does not service New York in any way."  *Id.*  As of today, Plaintiff's website states that "Crypto.com may not offer certain products, features and/or services on the Crypto.com App in certain jurisdictions due to potential or actual regulatory restrictions."  (Decl. Ex. 13.)  It states that New York is a "location" subject to "geo-restrictions" from "using" the Crypto.com App.  (Decl. Ex. 14.)

### C.    Plaintiff launches its "OG" platform in February 2026.

In the last five months, CFTC, which is operating with only one Commissioner, has abandoned more than a decade of policy on the legality of sports and political "event contracts." On February 4, 2026, CFTC withdrew both a 2024 notice of proposed rulemaking that would have clarified that event contracts involving sports and political betting may not be listed on exchanges and a recent staff advisory.  (Decl. Ex. 15.)[8]  The same day, Plaintiff launched the "OG" platform. (Compl. at 2 n.1; Decl. Exs. 17 and 18.)  Plaintiff also began using the d/b/a "OG."  *Id.*  Like Crypto.com, OG unambiguously advertises recreational wagering:

---

[7] *See, e.g.*, *Crypto.com*, (plaintiff-appellant); *KalshiEX v. Johnson*, CV-26-01715 (D. Arz. 2026) (intervenor-plaintiff); *U.S. v. Connecticut*, 3:26-cv-00498-VDO (D. Conn. 2026) (same); *U.S. v. Illinois*, 1:2026cv03659 (N.D. Ill. 2026) (same); *U.S. v. Wisconsin*, 2:26-cv-00749-WCG (E.D. Wis. 2026) (same pending); *Wisconsin v. Foris Dax Markets*, 3:26-cv-00381-wmc (W.D. Wis. 2026) (defendant; state remand pending).

[8] On March 12, 2026, CFTC published a purported notice of proposed rulemaking to which New York and 39 other states submitted a public comment emphasizing CFTC's lack of jurisdiction over sports-related "contracts."  (Decl. Ex. 16.)

  

*Three screenshots of* OG *Application provided via Google Play Store*, available at
https://play.google.com/store/apps/details?id=com.og.app.android

Upon information and belief, the event contracts Plaintiff offers on either (or both) of its Crypto.com or OG platforms are all self-certified for listing on Plaintiff's singular DCM. Said differently, Plaintiff is the exchange; Crypto.com and OG are merely two different platforms offering Plaintiff's event contracts to the public. Plaintiff alleges that the nature of many of OG's offerings are the same as the sports, elections, and entertainment/culture offered by non-parties Coinbase Financial Markets, Inc., and Gemini Titan LLC, over which the AG sued in April 2026. (*Id*. ¶¶2, 88–89; *see also* Decl. Ex. 19.)

Plaintiff does not allege that OG offers contracts to residents of all 50 states. Prior to its apparent extension to "New York residents," OG was reported to be unavailable "in Arizona and New York. If you're in Nevada, Ohio, Michigan, Maryland, Massachusetts, New Jersey, or Illinois, you can't trade sports contracts on OG, but everything else is available," similar to Crypto.com. (Decl. Ex. 10.) On July 2, 2026, Plaintiff filed a proposed intervenor complaint in

9

*U.S. v. Illinois*, 2026-cv-03659 (N.D. Ill. 2026) which states: "OG currently does not offer event contracts **_in Illinois_** because of the risk of unlawful prosecution by the state."  ECF No. 49-3, ¶82 (emphasis added).   This is contrary to Plaintiff's claim that OG does not "'restrict users' access…based on location."  (Mem. 23.)

      **D.**      **Plaintiff alleges it began offering its "OG" platform to "New York residents" on June 12, 2026 and sued Defendants the same day.**

Plaintiff does not explain why it waited four months between launching OG and expanding to "New York residents."  Plaintiff discusses only the *residency* of its users and nothing else about them, including *where* they are located when using its services.  For example, Plaintiff does not explain whether the "geo-restrictions" apparently in place over New York on the Crypto.com platform (Decl. Ex. 14) were also ever in place on the OG platform.  (By the same token, Plaintiff seems to make the contradictory inference that the platform could be accessed *in* New York before June 12 by "non-resident" users.)  Plaintiff is also silent as to how it determines who is a "New York resident" or how many users fit this description.

Plaintiff also appears to assume without any explanation that any liability under state law in connection with its gambling operations began to accrue on June 12, 2026, and merely by virtue of the fact that it accepts users who are "New York residents."  Whether Plaintiff is civilly liable and/or criminally culpable, beginning on what date, and to what extent are not at issue here.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy."  *Walden v. Kosinski,* 153 F.4th 118, 134 (2d Cir. 2025) (citation omitted).  In the Second Circuit, "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," Plaintiff "must establish a *clear or substantial* likelihood of success on the merits."  *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025)

(citations omitted) (emphasis added); *see also N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (heightened standard for preliminary injunction also applies when a party seeks to alter long-standing dynamics); *Williams*, at *4. Plaintiff must also show "[(2)] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [their] favor, and [(4)] that an injunction is in the public interest." *James*, 157 F.4th at 241 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). "When the government is a party to the suit, [the Court's] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (citation omitted).

## ARGUMENT

### I. PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. Gaming Commission Has Eleventh Amendment Immunity.

Gaming Commission is a state agency and therefore encompassed by New York's Eleventh Amendment immunity. *Williams,* at *4 (dismissing Gaming Commission)*; Cayuga Nation v. N.Y. State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) (same). New York has not waived its immunity, Congress did not abrogate states' immunity in enacting the CEA, and the state officials' exception in *Ex Parte Young*, 209 U.S. 123, 150–59 (1908), does not apply to Gaming Commission.

#### B. The Event-Contracts At Issue Are Not "Swaps" Under The CEA.

Plaintiff's preemption theory hinges on an assertion that the offerings at issue are "swaps" within the meaning of the CEA, 7 U.S.C. §1a(47)(A)(ii). (Mem. 11.) Plaintiff is incorrect.

11

### i.    Applicable Rules Of Statutory Construction

This Court has authority to interpret the CEA, including its definition of "swap." *Merrill,* 456 U.S. at 386–87 (construing CEA); *U.S. v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (same). "In the post-*Chevron* era…interpretation of the statute is a question of law, and…it is the court, and not the administrative agency, that determines its meaning." *Art & Antique Dealers League of Am. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024)).

"When interpreting a statute, we begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *New Jersey v. Bessent*, 149 F.4th 127, 145 (2d Cir. 2025) (cleaned up). Where meaning is ambiguous, a court may use "a variety of interpretive tools, including canons, statutory structure, and legislative history." *Id.* "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted).

### ii.    Plaintiff's "Event Contracts" Are Not "Swaps" Under Section 1a(47)(A)(ii)

Plaintiff claims that the offerings it puts at issue in this litigation fall are "swaps" under 7 U.S.C. §1a(47)(A)(ii), defined as:

> [an] agreement, contract, or transaction…that provides for any purchase, sale, payment, or delivery…that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

The District of Nevada rejected Plaintiff's claim that its sports offerings are swaps under this definition. *Crypto,* 815 F.Supp.3d 1169, at 1175–76; *see also Hendrick II*, 817 F. Supp. 3d at 1026–32 (same, as to Kalshi). Other federal districts have also ruled that sports offerings like Plaintiff's are not swaps. *Nessel*, 2026 WL 1895958, \*2–9 (same, as to Polymarket); *Schuler I*, 2026 WL 657004, at \*5–6 (same, as to Kalshi) These holdings are persuasive.

12

Concerning the "associated with a potential financial, economic, or commercial consequence" clause of Section 1a(47)(A)(ii),[9] *Hendrick II* held the text to mean:

> that the event or contingency is itself inherently[10] joined or connected with a potential financial economic, or commercial consequence. This means that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it. And it does not include consumer transactions that have not historically been known to be swaps, such as sports wagers.

817 F. Supp. 3d at 1027; *see id.* at 1027–32 (analyzing phrase). Similarly, *Schuler I* noted that the CEA's purpose is better met by the interpretation that "swaps are limited to events and contingencies that have a...direct and inherent association with matters of financial, economic, or commercial consequence." 2026 WL 657004, at *5 (cleaned up). *See also Nessel*, 2026 WL 1895958, at *6 (limiting "the potential economic consequences [to those] 'inherently joined or connected with' the events underlying the contract….include[s] agreements clearly within the scope of the term 'swap' as Congress would have understood it,… [and excludes] agreements with underlying events that are connected to financial consequences only through downstream, and theoretically infinite, chains of potential consequences."). Such an interpretation should be adopted here.

### a. Interpreting Section 1a(47)(A)(ii)

*__Plain Text__.* Defendants' reading, and that of *Crypto/Hendrick II, Nessel,* and *Schuler I*, aligns with the plain text of Section 1a(47)(A)(ii) and gives meaning to each of the significant

---

[9] Several courts have also found that sports "event contracts" do not meet the definition of "occurrence," "nonoccurrence," and "extent of the occurrence of an event or contingency" clauses in Section 1a(47)(A)(ii). *Crypto*, 815 F. Supp. 3d at 1180–87; *Hendrick II*, 817 F. Supp. 3d at 1026–32; *but see KalshiEX v. Orgel*, No. 26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026). While Defendants' memorandum focuses on the "associated" clause, no part of the definition is met by Plaintiff.

[10] As discussed *infra* 14–15, critiques that the word "inherently" should not guide the scope of the word "consequences" because "inherently" is not in the text are unconvincing and used to justify absurd statutory interpretations to "infinity," *Nessel*, 2026 WL 1895958, at *6.

limiting factors within the definition. *Horn v. Med. Marijuana*, 80 F.4th 130, 140 (2d Cir. 2023) (applying negative-implication canon).

To "associate" means to "connect (someone or something) with something else in one's mind" or to "connect (something) with something else because they occur together or one produces another." "Associate," New Oxford American Dictionary (2d ed. 2005). Such a connection in the mind cannot reasonably exist unless the potential effects on these types of conditions are sufficiently material and direct. Thus, Section 1a(47)(A)(ii) requires the event that is the subject of the contract to have "some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it." *Hendrick II*, 817 F. Supp. 3d at 1027.

Plaintiff offers no meaningful analysis of Section 1a(47)(A)(ii), claiming simply that "events"—apparently without limitation—"including sports events, carry *actual* financial, economic, and commercial consequences for a variety of market participants," and because Plaintiff's offerings "provide a means to hedge against the commercial risks of the underlying sports events," they are swaps. (Mem. 10.) Thus, it claims, its sports wagers are like the grain market, containing many entities in the market to hedge risk with a layer of "speculators" to provide liquidity. (Compl. ¶¶30, 40.) As discussed *infra*, Plaintiff does not provide any evidence to indicate that its offerings are used or are actually useful to hedge a risk.

Regardless, as a legal matter, Plaintiff's definition is wrong. Plaintiff's reading renders the "associated with" clause meaningless. "*Actual*" consequences, Plaintiff infers, can be *any* consequences, no matter how downstream, removed, or illogically obscure, and *regardless* of its association with that consequence. This subsumes the universe: "[a]nything can potentially have economic ramifications given enough attenuation and happenstance." *Nessel*, 2026 WL 1895958,

14

at *3.  The term "*associated with*" must be given meaning and reading it to "require[] an inherent connection with potential economic consequences" rather than a downstream, attenuated consequence gives the language "the more limited sense it frequently [has] in ordinary use rather than extending it to infinity," and consistent with the surrounding text.  *Id.* at *8.

Finally, the ordinary meaning of "swap" would also "not have been understood by educated users of the language to include 'sporting event contracts' to the extent that that category could be separated from sports betting, and the CFTC did not use the term 'swap' that way before [or after] the passage of Dodd-Frank." *Nessel*, 2026 WL 1895958, at *4.    For    example,    Section 1a(47)(A)(ii) closely mirrors a proposed definition of "OTC derivative instrument" sent by the Securities Industry Association ("SIA") (the predecessor to the Securities Industry and Financial Markets Association) to the SEC in 1998.  (Decl. Ex. 20.)  In this context, concerning OTC derivatives dealers, SIA proposed this language in considering of the scope of to, *inter alia*, "encompass[] the broad range of instruments that comprise OTC derivatives," (*id.* at 2), and none of which extended to sports wagering, (which was effectively banned under PAPSA at the time), or other types of gambling Plaintiff claims it can sell New Yorkers.

***Federal Statutory Context.***  Statutory context likewise confirms the phrase "associated with" must be given this appropriately constrained meaning.  *U.S. v. Miller*, 604 U.S. 518, 533 (2025).  Here, the other definitions of "swap" found in Section 1a(47)(A)(i)-(vi) "refer almost exclusively to financial measures, indices, or instruments." *Hendrick II*, 817 F. Supp. 3d at 1027; *Dubin v. U.S.*, 599 U.S. 110, 124–25 (2023) (applying *noscitur a sociis* canon concerning context of words).  That context reflects statutory principles and purposes that "are better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices.  Currency exchange rates, the weather, and

15

energy costs all do that; the number of points scored in the Huskies-Bobcats game does not." *Schuler I*, 2026 WL 657004, at *6.

Plaintiff's reading, in contrast, "risks rendering the other definitions of 'swap' [in §1(a)(47)(A)] superfluous." *Nessel*, 2026 WL 1895958, at *2; *U.S. v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (applying canon against superfluity). Defendants' reading, on the other hand, harmonizes §1(a)(47)(A) the other sub-definitions: "[r]equiring an inherent connection to a potential economic consequence might exclude, for example, weather swaps under §1a(47)(A)(ii), but would in no way exclude them from the overall definition, as weather swaps are specifically enumerated at §1a(47)(A)(iii)(XVII)….Reining in §1a(47)(A)(ii) from a boundless reach would not undermine the definition's ability to capture Congress's intended targets." *Nessel*, 2026 WL 1895958, at *7. Plaintiff's expansive reading would also necessarily encompass all *licensed gaming* because the CEA makes it generally *unlawful* for retail customers to enter into a "swap" outside of a DCM. 7 U.S.C. §2(e).

When Congress refers to conduct commonly understood to be gambling, betting, or wagering, it speaks clearly and explicitly. Such laws also manifest "a coherent federal policy: They respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484; *see also Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 187 (1999). For example, 18 U.S.C. §1084 "outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event…if the underlying gambling is illegal under state law." *Murphy*, 584 U.S. at 484. Similarly, under 18 U.S.C. §1955, "operating a gambling business violates federal law only if that conduct is illegal under state or local law." *Id*. Numerous other federal laws reflect this deference to states concerning gambling.[11] Thus, federal

---

[11] *See* 15 U.S.C. §§3001(a)(1), 1178; 18 USC §§1952–1953; 31 U.S.C. §§5362–5363

16

law consistently evinces an intent to *support and assist* state police efforts, not *eviscerate* them. *See Martin*, 793 F. Supp. 3d at 679–84.

A more limited reading is also supported by the "background principle" that when a federal statute touches on "areas of traditional state responsibility," courts must look for a clear statement from Congress that it intended to "effect a significant change in the sensitive relation between" the federal and state governments. *Bond v. U.S.*, 572 U.S. 844, 858–59 (2014). Congress did not intend to legalize and centralize sports, political, or entertainment/culture betting under the CEA, severely undermining additional federal statutes, and preempting the states from regulating gambling, so long as for-profit DCMs self-certify their bets as "event contracts." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes."); *Martin*, 793 F. Supp. 3d at 683; *see also Epic Sys. v. Lewis*, 584 U.S. 497, 510 (2018) (presumption against implied repeals).

***Major Questions Doctrine.***  The major-questions doctrine provides yet another reason to reject Plaintiff's interpretation. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (employing major-questions and federalism canon, and notion that the "sheer scope" of an agency's interpretation would counsel against its position).  "[C]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up); *Ala.*, 594 U.S. at 764.  Gambling is unquestionably an area of vast economic and political significance, particularly given, for example, the speed and volume of cash exchanged, state taxation, job creation, and government regulation.

***Legislative History.***  Finally, Dodd-Frank sought to remedy regulatory failures concerning credit-default swaps and other derivatives following the 2008 financial crisis. *Hendrick II*, 817 F.

17

Supp. 3d at 1028–29; *Nessel,* 2026 WL 1895958, at *3–4. "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector….Congress was not enabling nationwide gambling on CFTC-designated exchanges." *Hendrick II*, 817 F. Supp. 3d at 1031. Indeed, "Congress had nothing like Plaintiff's products in mind when it defined 'swap.'…The markets with which Congress was concerned were dominated by large financial institutions and did not involve individuals staking relatively small amounts of money on the outcome of a football game." *Nessel*, 2026 WL 1895958, at *4. The legislative debate even addressed that "swaps" do not reach sports betting because these "types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." 56 Cong. Rec. S5902-01, 2010 WL 2788026, at S5906–07; *see also Williams,* at *9.

### b. Applying Section 1a(47)(A)(ii)

Thus defined, "swaps" are not what Plaintiff is selling. Plaintiff has no evidence whatsoever of market needs these wagers purport to fill. To the contrary, Plaintiff's customers are encouraged to bet "as entertainment," not for any economic purpose. *Hendrick II*, 817 F. Supp. 3d at 1029; *see supra* 6. Plaintiff mentions "a variety of market participants" (but not retail customers) and alleges "sports events" create a hypothetical risk to "merchandise vendors" or "broadcasters who promote and air the events themselves," (Mem. 11), and other hypothetical scenarios (Compl. ¶49(a)-(f)), but Plaintiff provides no evidence to support its hypothesis regarding the nature of its contracts. Plaintiff's own advertising certainly contains no indication of the alleged "hedging" function of its product. *Supra* 6, 9. Plaintiff's declaration speaks to irreparable harm and does not provide any evidence to back up Plaintiff's unsubstantiated allegations of the existence of *any* economic purpose of any of its offerings. (*See generally* Kallback Decl.; Compl. ¶¶49–50.) And Plaintiff does not attempt to explain, for example, the alleged economic purpose underlying whether a quarterback will throw for 175 yards but not more

18

than 200 yards in a given football game, or whether an astronaut will be Time Magazine's Person of the Year, or whether a CEO will say the word "staking" on an earnings call.  Totally lacking economic purpose, there is also no real hedging utility or stability.  In one instance, a CEO chose to "troll" gamblers by saying all the words people bet he would say because he thought it was funny.  (Decl. Ex. 21.)  As a result, even using Plaintiff's interpretation of the meaning of "swap," Plaintiff has not remotely carried its evidentiary burden.

Moreover, these unsupported allegations are exactly the kinds of remote and downstream externalities that cannot reasonably fall within any definition of "swaps."  *See Hendrick II*, 817 F. Supp. 3d 1027; *Nessel*, 2026 WL 1895958, at *3 ("[Although] outcomes of sporting events can have economic ramifications in terms of 'the team's valuation, retailers' sales of team merchandise, and the hometown economy[,]'…[t]hese are all potential consequences dependent on the reactions of parties outside the game," falling outside the definition of "swaps").

Cases that have found otherwise—*Flaherty,* 172 F.4th at 227–28; *KalshiEX v. Johnson*, 2026 WL 1223373, at *5 (D. Ariz. 2026); and *Orgel*, 2026 WL 474869, at *7–8—apply unnecessarily maximalist, "pretty broad," and "lenient" approaches to their reading (*Orgel* at *8), and none considers the meaning in the context of the larger statute, any canon of construction, or the historical context, and only give passing consideration of pre-Dodd-Frank legislative history.

*Flaherty*, for example, refused to address that its interpretation of "swap" would yield absurd results like "bingo games to pingpong matches" falling under the CEA, claiming it to be unnecessary because CFTC itself has the authority to promulgate rules with a narrower construction.  172 F.4th at 228; *Johnson*, 2026 WL 1223373, at *5 (same).  But these answers avoid reconciling that Plaintiff's interpretation of "swap," on its face, *does* allow anyone to avoid state regulations of, for example, ping-pong matches, simply by registering as a DCM and self-

19

certifying offerings, a result that is patently contrary to the structure of the CEA, the intent of Congress, numerous canons of statutory constructions noted above, and the legislative history.

### iii.    Even If The Event Contracts Are "Swaps," the CEA Does Not Preempt New York Laws

There are three types of federal preemption: (1) "express," (2) "field," where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law;" and (3) "conflict" where state law conflicts with federal law "[i] such that it is impossible for a party to comply with both or [ii] the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (cleaned up). Plaintiff bears a "considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (cleaned up). Plaintiff's claim fails under all three theories, just as nearly identical claims failed in *Williams* and other courts.

### a.  The CEA Does Not Expressly Preempt New York Law.

Express preemption occurs when "a federal statute expressly directs that state law be ousted." *Ass'n of Int'l Auto. Mfrs. v. Abrams*, 84 F.3d 602, 607 (2d Cir. 1996). If "a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008). "The purpose of Congress is the ultimate touchstone in every pre-emption case," discerned in part from the "structure and purpose of the statute as a whole," and the court's "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic v. Lohr*, 518 U.S. 470, 485–86 (1996) (cleaned up).

20

Plaintiff's express preemption argument begins and ends with the two words "exclusive jurisdiction" from Section 2(a)(1)(A), claiming states cannot "assert[] their authority to regulate" because its offerings are "swaps" traded on an DCM. (Mem 10–11.) This argument fails.

Section 2(a)(1)(A) does not establish that Congress's clear and manifest purpose was to preempt New York gaming law. Section 2(a)(1)(A) addresses "jurisdiction," rather than "preemption," and includes multiple savings clauses and vague language concerning its scope and effect. *Schuler II*, 2026 WL 1295806, at *4. Section 16(e)(2) and (h)(2), on the other hand, *are* express preemption clauses that preempt state gaming laws only for certain limited kinds of swaps not at issue here, and state law as to insurance contracts, respectively. *Id*. at *4. Congress's choice to "expressly preempt only certain categories of state laws shows that it did not mean to 'withdraw' the States' power to enact all such laws in other circumstances." *Id.* (citation omitted). "Had Congress foreseen an overlap of swaps and traditional gambling contracts like it foresaw an overlap of swaps and traditional insurance contracts, it knew how to craft a provision to preempt state law, as it did for security-based instruments. The lack of any such provision indicates that Congress did not believe an overlap of swaps and traditional gambling existed." *Nessel*, 2026 WL 1895958, at *4.

### b.  The CEA Does Not Field-Preempt New York Law.

Field preemption is "rare" and "occurs when Congress manifests an intent to occupy an entire regulatory field to the exclusion of the states." *N.Y. State Telecomms. Ass'n. v. James*, 101 F.4th 135, 147 (2d Cir. 2024). "In all pre-emption cases," courts presume Congress did not preempt state law, "particularly" in "a field which the States have traditionally occupied." *Medtronic*, 518 U.S. at 485 (cleaned up). "[B]ecause the States are independent sovereigns in our federal system," courts "start with the assumption that the historic police powers of the States were

21

not meant to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. (citation omitted).

Here, "the presumption against preemption applies[.]" *Martin*, 793 F. Supp. 3d at 677; *see also Schuler II*, 2026 WL 1295806, at *5; *Williams*, at *5–6. States' authority to regulate gambling conducted within their borders is long established. *See, e.g., Murphy*, 584 U.S. at 458–59; *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). New York law regulating and policing gambling spans 250 years. *See supra* 3.

*William*, *Schuler II*, *Martin*, and *Nessel*, all correctly found that the CEA does not field-preempt state gaming laws. *Williams*, *6–7; *Schuler II*, 2026 WL 1295806, at *5; *Martin*, 793 F. Supp. 3d at 684; *Nessel*, 2026 WL 1895958, at *11; *see also Flaherty*, 172 F.4th at 236–38 (Roth, J., dissenting).

First, as discussed *supra* 21, "the presence of a savings clause usually signals that Congress does not mean to preempt the field," and Section 2(a)(1)(A) indicates that "Congress did not intend to preempt the field of futures trading." *Schuler II*, 2026 WL 1295806, at *5. "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by CEA." *Williams*, at *7; *see also Nessel*, 2026 WL 1895958, at *10 (The "'[e]xcept as hereinabove provided' language [in the jurisdictional savings clause]…does not suggest that it completely removed [state regulators'] ability to enforce state law."). The legislative history Plaintiff uses to interpret "exclusive jurisdiction" predates Dodd-Frank and the Special Rule (Mem. 14–15), and "the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption." *Martin*, 793 F. Supp. 3d at 683; *see also Schuler I*, 2026 WL 657004, at *8.

22

Second, reading the "exclusive jurisdiction" provision in Section 2(a)(1) to preempt *all* state gaming law would render the express preemption clauses in Section 16(e)(2) and (h)(2) meaningless. *See Schuler II*, 2026 WL 1295806, at *4; *Martin*, 793 F. Supp. 3d at 680–81; *Williams*, at *7.

Third, there is no comprehensive statutory scheme through which Congress intended to occupy the field as Plaintiff claims. The Special Rule's allowance for exclusions based on state law confirms that Congress intended for some state laws to operate alongside the CEA. *Schuler II*, 2026 WL 1295806, at *5; *Williams*, at *7. "[W]here 'coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.'" *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 567 (S.D.N.Y. 2017) (quoting *Hughes v. Talen Energy Mktg.,* 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring)). Thus, there is no field preemption here because the CEA "often permits state regulation." *Schuler II*, 2026 WL 1295806, at *5. Plaintiff's claim that it "does not act as a 'bookmaker'" in order to justify different regulatory schemes (Compl. ¶48) reflects a fundamental misunderstanding of the scope, function, and purpose of New York gambling laws, which apply whether the state licensee is a counterparty to a wager or facilitates and profits from peer-to-peer gambling. *See, e.g.*, 9 NYCRR §5324.42(o) (regulation of rake in casino peer-to-peer poker games); (*see also* Decl. Ex. 22 (example of mobile sports licensee administering peer-to-peer gambling).)

Finally, as discussed, *supra* 16–18, "[i]t is highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text and legislative history." *Martin*, 793 F. Supp. 3d at 682; *Schuler I*, 2026 WL 657004, at *8 ("History reveals no evidence that Congress intended to preempt state sports gambling laws."). "[G]iven that the power to

23

regulate gambling is a traditional police power exercised by New York, the Court also declines to interpret the CEA's grant of exclusive jurisdiction as leaving 'no room for supplementary state legislation.'" *Williams*, at *7 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)).

Plaintiff relies on *Flaherty* to argue that "the whole point of the CEA's exclusive jurisdiction provision was to preempt parallel state regulation." (Mem. 13 (citing *Flaherty*, 172 F.4th at 230).)  Among the flaws in that decision (and *Johnson* and *Orgel*), *Flaherty* did not apply a presumption against preemption and limited its analysis to interpreting Section 2(a)(1)(A), without considering whether Congress manifestly intended to preempt state gaming laws with the addition of "swaps" to the CEA.  *Flaherty* also determined that there was no historic state police power at issue because "[s]tates have long regulated intrastate gambling,  but not interstate gambling."  172 F.4th at 230 n.4 (citing *Churchill Downs Tech. Initiatives v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025)).  However, *Flaherty* ignored the Supreme Court's guidance that courts must look to "the *target* at which the state law *aims* in determining whether that law is pre-empted."  *Oneok v. Learjet*, 575 U.S. 373, 385 (2015) (emphasis in original).  In *Oneok*, because the state law was found to directly "target" a related federal statute, *Churchill Downs*, 162 F.4th at 639, the court did not apply the presumption.  *Id*. at 641 n.5.  Had the state law not "target[ed] the [federal] scheme," there "might not [have] be[en] a conflict," as here, because "any effect" on the federal law "would lie downstream of Michigan's earnest effort to regulate its residents' primary conduct."  *Id*. at 639.

*Flaherty* also incorrectly deferred to DCMs' assertion that their "swap" self-certification could exempt them from state compliance.  *See Hendrick II*, 817 F. Supp. 3d. at 1025–26 ("A DCM cannot insulate itself from state regulation through self-certification where its conduct does

24

not fall within the CFTC's exclusive jurisdiction provision."). Finally, *Flaherty* did not consider either Section 16(e)(2) or 16(h). 172 F.4th at 229.

Plaintiff's other cases are also unavailing. (Compl. ¶3 n.2; Mem. 12–14; 20–21.) Almost all significantly pre-date Dodd Frank and none address the interplay of CFTC jurisdiction and state law in an area historically reserved to the states' police powers where the CEA preserves state law and Congress manifested no preemptive intent. *See also Martin*, 793 F. Supp. 3d at 682 (discussing *Am. Agric. Movement v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) and *Effex Cap. v. Nat'l Futures Ass'n,* 933 F.3d 882, 894 (7th Cir. 2019).)

Neither the structure, context, nor legislative history of the CEA support or "establish that Congress clearly and manifestly intended to preempt state sports-betting laws." *Id.*; *Williams*, at *7. Plaintiff's field preemption argument therefore fails.

### c. The CEA Does Not Conflict-Preempt New York Law.

Conflict preemption exists where state law conflicts with federal law "such that it is impossible for a party to comply with both or the [state] law is an obstacle to the achievement of federal objectives." *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017). Burdens under both branches of conflict preemption are "heavy" and "sharp." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (quotation omitted) ("*MTBE*").

"[I]mpossibility occurs when state law penalizes what federal law requires, or when state law claims directly conflict with federal law." *Figueroa,* 864 F.3d at 234 (cleaned up). Impossibility is a "demanding defense, and [the Second Circuit] will not easily find a conflict that overcomes the presumption against preemption." *MTBE*, 725 F.3d at 97 (cleaned up). "If there was any available alternative for complying with both federal and state law—even if that alternative was not the most practical and cost-effective—there is no impossibility preemption." *Id.* at 99.

25

Obstacle preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective." *Id*. at 101 (cleaned up). "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id*. (same). The "mere fact of tension" is not sufficient for preemption; the conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id*. at 101–02 (same). Significantly, conflict preemption does not lie even where "it is possible, even likely, that a [state] restriction…could make it much less profitable" to operate in New York. *Seggos*, 121 F.4th at 436.

There is no impossibility or obstacle preemption here. Like field preemption, because New York has historic police powers over gaming, the court considers whether Congress manifested its intent to preempt through the scope, structure, and purpose of the CEA. *Figueroa*, 86 F.3d at 232. For the reasons set forth *supra* 15–18, the answer here is no. Plaintiff has therefore failed to demonstrate how any New York law conflicts with or stands as an obstacle to achieving the CEA's purposes. (Mem. 17–21.) *Williams*, *Schuler I*, *Martin*, and *Nessel*, each declined to find conflict preemption and are persuasive on this point. *Williams*, *at* *8–9 ("Although complying with New York gambling laws imposes an additional regulatory requirement on Kalshi, that requirement is not squarely contrary to federal law."); *Martin*, 793 F. Supp. 3d at 684–86, *Nessel* 2026 WL 1895958, at *11-13, *Schuler I*, 2026 WL 657004, at *9 ("Kalshi offers nothing but its own ipse dixit that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'").

Plaintiff's first argument that conflict preemption is satisfied because a DCM might have to comply with more than just federal law, resulting in a "patchwork," and a lack of "uniformity," of regulations (Mem. 17–18) merely repeats its field preemption argument. It is belied by the fact

that the DCMs are subject to state law in other areas. *Schuler II*, 2026 WL 1295806, at *5–6. Moreover, the "CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs….New York's gambling laws, which seek to regulate gaming in the state, complement rather than conflict with federal law." *Williams*, at *9.

Plaintiff's second argument that New York law creates conflicting enforcement regimes (rather than conflicting substantive provisions) has no support in either the statutory text or in reality. (Mem. 18–20.) In contrast to the law in *Arizona v. United States*, 567 U.S. 387 (2012), which Plaintiff relies on, the laws at issue here do not attempt to achieve the same goals as the CEA by a different means. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 959 F3d 1201, 1224 (9th Cir 2020) ("The potential for overlapping state and federal penalties has never, without more, raised the inference that Congress intended to preempt state law."). Rather Defendants merely wish to continue enforcing their historic police powers which "complement rather than conflict with federal law." *See Williams*, at *7. This is also true for any state claim brought under Executive Law 63(12) in connection with the Wire Act. Plaintiff's argument raising "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl. 2." *Garcia*, 589 U.S. at 212.

Finally, Plaintiff's claim that the CEA's requirement to provide "impartial access to its markets and services" under 17 C.F.R. §§38.151(b) and 38.150 conflicts with state law, Mem. 20, was correctly rejected by *Williams*, *Schuler II*, *Martin*, and *Nessel*. *Williams*, at *8; *Schuler II*, 2026 WL 1295806, at *6; *Martin*, 793 F. Supp. 3d at 686; *Nessel*, 2026 WL 1895958, at *11; *see also Flaherty*, 172 F.4th at 239 (Roth, J., dissenting). Regulatory history shows the "impartial

27

access" rules mandate access for participants of all economic means, not geographic locations. *See, e.g.*, *Schuler II*, 2026 WL 1295806, at *6.  Ceasing to offer sports, elections, and entertainment/social "event contracts" in New York would therefore not run afoul of this rule. *Id.* ***In fact, Plaintiff's own conduct demonstrates that it does not consistently operate in all 50 states***. *Supra* 7–10.  Plaintiff has apparently withdrawn its offerings from some state markets, never entered others, expanded to New York residents on June 12—all while attesting that its self-certifications have always complied with CFTC regulations.  OG's claim is contractionary nonsense. (Mem. 4–5 (citing 7 U.S.C. §7a-2(c)(1)).)

There is no preemption here.

## II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

"To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology*, 131 F.4th 102, 106 (2d Cir. 2025) (cleaned up).  Plaintiff failed to do so.

Plaintiff's claimed harms are speculative, unsupported, and self-inflicted.  The argument that it simply had *no "choice"* but to begin offering sports bets to New Yorkers on June 12 and then, once it began, to keep offering them indefinitely (Mem. 22–24) is entirely contrived and undermined by its own start-and-stop behavior across the country.

*First*, Plaintiff's argument that it faces irreparable harm from enforcement of preempted laws (Mem. 22–23) fails because Plaintiff is unlikely to succeed on its claims.  *Patriots*, 17 F.4th

28

at 294; *Williams*, at \*10, *Nessel*, 2026 WL 1895958, at \*13.[12]  Contrary to Plaintiff's suggestion, there is also no presumption of irreparable harm for violations of constitutional provisions that serve structural purposes, such as the Supremacy Clause.  *See Chan v. U.S. Dep't of Trans.*, No. 23-cv-10365, 2024 WL 5199945, at \*45–46 (S.D.N.Y. Dec. 23, 2024); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989).

*Second*, Plaintiff fails to establish that future civil enforcement by Defendants would cause irreparable harm.  (Mem. 23.)  Gaming Commission civil penalties "follow[] a hearing or opportunity to be heard," Racing Law §116, and may be challenged in court.  *Pletcher v. N.Y. State Gaming Comm'n*, 249 A.D.3d 1290 (3d Dep't 2026); *Williams*, at \*10 ("[A]ny civil fines that may be levied against Kalshi can be challenged and vacated if Kalshi ultimately prevails[.]").  The *Coinbase* and *Gemini* civil state enforcement proceedings brought by the AG on which Plaintiff relies also involve an opportunity to be heard.  As for threat of imminent criminal enforcement by the AG, Plaintiff's allegations are speculative.

*Third*, Plaintiff will not suffer irreparable harm if it *stops* its offerings at issue in New York.  (Mem. 23–24.)  Plaintiff principally argues that it is burdensome to implement "geofencing," a technology it claims it does not have, to exclude users located in New York.  Defendants note that this is contrary to Plaintiff's own claim that it does not offer event contracts on OG ***in*** Illinois, and elsewhere.  *Supra* 9–10.  Nor does Plaintiff explain why whatever technology it does possess cannot be used to at least mitigate its harm while it acquires geofencing.  *See also Hendrick II*, 817 F. Supp. 3d at 1035 ("Kalshi's monetary harm can be mitigated through geofencing, which

---

[12] Plaintiff's reliance on *Morales v. Trans World Airlines*, 504 U.S. 374 (1992), is misplaced.  First, the Court specifically found the challenged state acts were preempted. *Id.* at 383–91.  Second, *Morales* invoked principles allowing for equitable jurisdiction where state actors plan imminent action on laws providing for increased penalties for "continuing or repeated" violations and, unlike here, the plaintiff "*lacks the realistic option of violating the law once and raising its federal defenses*." *Id.* at 381 (emphasis added). Nothing prevented Plaintiff from teeing up its case either by not violating the law or offering a single gaming events contract to minimize purported "harm."

regulated entities in this jurisdiction employ.").  According to Plaintiff, it offered events contracts on OG in other states for *months* without offering them to New York residents.  Supra 8–10. Plaintiff should be able to return to at least its pre-June 12 operations, especially where it has stopped offerings elsewhere.  *Id.*

Moreover, accepting *arguendo* Plaintiff's vague "estimate" that it would cost "millions of dollars annually" to implement geofencing (Kallback Decl. ¶¶12–14),[13] "ordinary compliance costs"—such as those associated with regulated industries—"are typically insufficient to constitute irreparable harm." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171–72 (2d Cir. 2025) ("implementing age-verification procedures" and "relabeling products" were compliance costs); *Williams*, at *10 (geofencing-related costs were "the ordinary burdens and costs of complying with government regulation."").  (*Cf.* Decl. Ex. 24 (non-party stipulation re implementation of geolocation).)

*Fourth*, Plaintiff argues that ceasing to offer sports event contracts in New York would risk its DCM status or other CFTC penalties by putting Plaintiff out of compliance with CFTC Core Principles.  (Mem. 24.)  Yet, compliance with New York laws would not violate the "impartial access" or "market disruptions" principles.  *Supra* 27–28.[14]  Plaintiff has started and stopped its offerings in other states, and it offers no evidence that CFTC has threatened it with revocation or other penalties.  *See also Williams*, at *10 (rejecting this as "mere speculation" because Kalshi "has been denied injunctive relief" elsewhere but "CFTC has not altered Kalshi's DCM status").[15] While Plaintiff may claim in reply that CFTC recently ordered non-party KalshiEX LLC to defy a

---

[13] Industry participants dispute alleged high costs of geolocation.  (Decl. Ex. 23.)

[14] Plaintiff improperly invokes alleged harms to its users. Federal litigants are generally "barred from asserting the rights of others to obtain relief for injury to themselves."  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988) (citation omitted).

[15] Nor has Plaintiff alleged that CFTC provided the notice required by 7 U.S.C. §8(b).

state court injunction and fulfill its executed contracts in Michigan, this does not alter the outcome here. Even assuming *arguendo* that CFTC's order is lawful, and even assuming a third-party's conduct can generate irreparable harm to enjoin the actual Defendants *here*, CFTC has not issued any orders with respect to Plaintiff's *New York* contracts.

*Fifth*, Plaintiff's alleged harm to its "reputation" and "goodwill" is vague and speculative. (Mem. at 24; Kallback Decl. ¶¶29–31.) Plaintiff provides no information about the number of New York users or contracts, let alone establishes that harms associated with these positions threaten the "very viability of [its] business." *Tom Doherty Assocs. v. Saban Ent.*, 60 F.3d 27, 38 (2d Cir. 1995). Plaintiff did not go out of business ceasing to offer contracts following Nevada's enforcement or limiting its offerings in certain states. Moreover, any lost "goodwill" stems from Plaintiff's decision to expand its sports events contracts to New York notwithstanding multiple courts finding that state gambling laws likely apply to them. *See Convergen Energy WI v. L'Anse Warden Electric*, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (plaintiffs cannot "manufacture" "exigency" for irreparable harm); *Commonwealth v. KalshiEX*, 2026 WL 188019, at *8 (Mass. Super. Ct. Jan. 20, 2026) (rejecting Kalshi's arguments that compliance with state laws would "risk its DCM status and reputation" and "pose burdensome feasibility challenges," as Kalshi "chose" to take these risks "head-on[.]").

Finally, Plaintiff's argument that its alleged monetary harm is irreparable because of sovereign immunity is misplaced. (Mem. 22.) Plaintiff merely alleges hypothetical future monetary harms that, as demonstrated above, fail to establish irreparable harm. An insufficient showing as to irreparable monetary harm is not transformed into an adequate showing when asserted against state defendants. *See Council for Responsible Nutrition*, 159 F.4th at 171–72 (no irreparable harm on claims against state defendants where alleged monetary losses were "ordinary

31

compliance costs" or "conclusory and speculative predictions"); *Freedom Holdings v. Spitzer*, 408 F.3d 112, 114–15 (2d Cir. 2005) (similar).

## III.  THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION

When the government is a party, the Court's "inquiries into the public interest and the balance of the equities merge."  *Patriots*, 17 F.4th at 295. "In balancing the equities, we first acknowledge the harm the government Defendants would suffer if enjoined from effectuating statutes enacted by representatives of its people." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 249 (2d Cir. 2025) (cleaned up), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026).   The inability to enforce its own laws "clearly inflicts irreparable harm on the State," *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (citation omitted), "particularly where there would be an ongoing and concrete harm to public safety interests." *Our Wicked Lady v. Cuomo*, 2021 WL 915033, at \*7 (S.D.N.Y. Mar. 9, 2021) (cleaned up).  Here, the equities strongly favor New York's interest in protecting the public's welfare over the interests of a large corporation attempting to shield itself from longstanding state regulation.

State regulations contain numerous consumer protections, implementing detailed measures for responsible gaming, age verification, and problem gambling prevention, among other things. For example, sports wagering is prohibited for individuals under 21. *See, e.g.*, 9 NYCRR §§5330.8, 5330.10(d)(5), 5330.19. New York also restricts advertising, marketing, and promoting mobile sports wagering to underage persons. Racing Law §1367-a(4)(e); 9 NYCRR §5330.45. Ads must display clear information about the risks of gaming. 9 NYCRR §5330.34 (responsible gaming). Gambling on any New York-based college sports team is prohibited.  Racing Law §§1367(1)(s), 1367-a(4)(a)(xi); *see also* 9 NYCRR §5330.13.

These and other numerous regulatory mechanisms exist for vital reasons.  As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related

32

helpline calls made by New Yorkers.  (Decl. Ex. 25.)  Evidence suggests those with gambling addictions are suffering relapses from exposure to prediction markets.  (Decl. Ex. 26.)  The NCAA, NBA, and PGA have all raised significant concerns about underage participation.  (Decl. Ex. 27.)  Yet DCMs market themselves broadly to entice the public into recreational gambling, and individuals as young as 18 may use their platforms.  (Decl. Ex. 28.)  Over NCAA objections, "prediction markets have begun offering contracts that resemble prop bets [on college athletes], carrying the same risks of manipulation and corruption that the NCAA is actively seeking to address."  (Decl. Ex. 29.)

New York's strong interests in preventing unlicensed betting activities from proliferating outweighs the types of harms articulated by Plaintiff here, particularly given that Plaintiff is unlikely to succeed on the merits.  *Williams*, at *10.[16]  Plaintiff does not cite a single existing CFTC regulation that contains any gambling regulation equivalent to New York's safeguards.

Even assuming Plaintiff demonstrated some sort of irreparable monetary harm, industry participants dispute high geolocation costs (Decl. Ex. 23), and the balance favors Defendants. Plaintiff's current customers can obtain the same services—online sports betting—through properly licensed organizations with heightened consumer protections.  The equities favor Defendants.

## IV.    THE COURT SHOULD IMPOSE A BOND

Notwithstanding the above, if the Court grants an injunction, Defendants respectfully request that the Court impose a bond on Plaintiff in an amount to be determined upon the parties' supplemental briefing.  Fed. R. Civ. P. 65(c); *see KalshiEX v. Flaherty*, 2025 WL 1218313, at *8 (D.N.J. Apr. 28, 2025) (setting bond).

---

[16] *See also Crypto*, 815 F. Supp. 3d at 1187; *Hendrick II*, 817 F. Supp. 3d at 1035–36; *Schuler I*, 2026 WL 657004, at *10, *aff'd* 2026 WL 1295806, at *7; *Nessel*, 2026 WL 1895958, at *13; *Comm.*, 2026 WL 188019, at *8.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's preliminary injunction motion.

Dated: New York, New York
     July 27, 2026

                    Respectfully submitted,


                    LETITIA JAMES
                    Attorney General
                    State of New York
                     *Attorney for Defendants*

                    By: /s/ *Katherine Rhodes Janofsky*

                    KATHERINE RHODES JANOFSKY
                    ROBERT ARNAY
                    ZACHARY MANLEY
                    Assistant Attorneys General
                    28 Liberty Street, New York, NY 10005
                    (212) 416-8621
                    Katherine.Janofsky@ag.ny.gov

## <u>WORD COUNT CERTIFICATION</u>

In accordance with Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Individual Practices and the Court's July 21, 2026 Order (ECF 48), I hereby certify that the MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION contains 10,242 words (including footnotes), exclusive of cover page, tables of contents and authorities, and signature block, as established using the word count function of Microsoft Word.

By: /s/ *Katherine Rhodes Janofsky*


KATHERINE RHODES JANOFSKY
Assistant Attorney General

35